## IN THE SUPREME COURT OF MISSISSIPPI
### NO. 1998-CA-01274-SCT

*ROBERT P. THEOBALD AND KARLEEN D. THEOBALD*

*v.*

*RUSTY NOSSER AND KAREN L. NOSSER*

| | |
|---|---|
| DATE OF JUDGMENT: | 07/31/1998 |
| TRIAL JUDGE: | HON. VICKI R. BARNES |
| COURT FROM WHICH APPEALED: | WARREN COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANTS: | DAVID M. SESSUMS |
| ATTORNEYS FOR APPELLEES: | WILLIAM ALLEN HOOD |
| | A. J. 'BUDDY' DEES, JR. |
| | W. BRIGGS HOPSON, III |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED IN PART, REVERSED, RENDERED, AND REMANDED IN PART - 12/16/1999 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 01/06/2000 |

## BEFORE PRATHER, C.J., BANKS AND McRAE, JJ.

## PRATHER, CHIEF JUSTICE, FOR THE COURT:

### I. INTRODUCTION

¶1. This Court is asked to determine whether an improperly executed promissory note, coupled with the actions of the parties, gave rise to a contract for the sale of a grocery store. If a contract did exist, we must then determine if it was breached, and if so, what damages flowed from the breach. The Warren County Chancery Court found that the contract was valid and subsequently breached, and held that although each party was injured and suffered damages, their damages canceled each other out. This Court affirms on the existence of a contract, but reverses and renders on damages.

### II. FACTS

#### Negotiations between the Parties

¶2. Robert and Karleen Theobald owned and operated the Eagle Lake Grocery and Deli (Grocery)

located on Eagle Lake in Warren County, Mississippi. In early January, 1997, Robert Theobald entered into negotiations for the sale of the Grocery and agreed for Rusty Nosser and his wife, Karen, to buy the Grocery for $175,000. Although there is no disagreement that the purchase price was $175,000, there is disagreement over whether the purchase was contingent on the Nossers' ability to obtain suitable financing. The Theobalds argue that there was no such contingency, while the Nossers argue that the purchase was contingent upon the procurement of financing.

¶3. On February 28, 1997, a blank Promissory Note (Note) provided by Mr. Theobald was signed by Mr. and Mrs. Theobald and Mr. and Mrs. Nosser. The Note described the Grocery by title and physical address, stated that $175,000 was due the Theobalds on March 31, 1997, and stated that "[i]f this Note is not paid promptly in accordance with its terms, the Undersigned agrees to pay all costs of collection, including reasonable attorney fees." However, the Theobalds signed the Note as Maker and Co-Maker while the Nossers signed it as Guarantors. Mr. Nosser testified that the sole purpose of the Note was to have a document reflecting the agreed upon purchase price, so as to prevent a future dispute over said price. The Note makes no mention of the purchase being contingent upon the securing of financing by the Nossers, and at that point, neither party was being assisted by counsel in this matter.

## Actions of the Parties

¶4. Per their agreement, the Nossers took over the Grocery on March 1, 1997. At this time, Mr. Theobald closed his business bank account at Trustmark National Bank and surrendered his tax ID number, said ID number being the only means with which he could purchase inventory at wholesale prices. Meanwhile, Mr. Nosser changed the Grocery's name, opened a business account at the Bank of Mississippi under the new name, and changed the electricity over into his name, which required him to make a $1,675 deposit. Additionally, he rearranged the layout of the Grocery, gave away or destroyed some furnishings left behind by the Theobalds, and installed a new cash register, stereo and canopy of outdoor lights at a total expense of $1,851.86. Mr. Nosser did not ask for, nor did Mr. Theobald give, permission for any of these changes to be made, and the Note makes no mention of allowing any such changes. Additionally, it appears from the record that Mr. Theobald exercised no oversight over the operations of the Grocery while it was being run by Mr. Nosser.

¶5. Mr. Nosser unsuccessfully attempted to obtain financing from several different sources, and when the Note became due on March 31, 1997, he did not pay the Theobalds any money. Mr. Nosser applied for and received a $3,000 loan from the Bank of Mississippi on April 3, 1997, and soon thereafter paid the Theobalds a total of $5,000. Mr. Nosser testified that he was paying Mr. Theobald "for the use of the business," while Mr. Theobald testified that he never discussed renting the Grocery with Mr. Nosser.

¶6. On April 28, 1997, the Nossers permanently ceased their operation of the Grocery, and instructed their employee, Marsha Brewer, to deliver the key to the store to Mr. Theobald. However, Mr. Theobald refused to accept it. Mr. Nosser then sent Mr. Theobald a letter stating that he had vacated on April 28, and that the electricity would remain on until May 5, 1997. On May 13, 1997, the Theobalds sold the Grocery to Brenda Jacks for $160,000. At the time the Nossers vacated the Grocery, no deed or bill of sale on the inventory had been transferred to them, and the only written instrument between the parties was the Note which they signed.

¶7. No inventory was taken when the Nossers entered the Grocery on March 1, nor was any taken upon their exit on April 28. The only tangible evidence regarding inventory was presented when Mr. Nosser

attempted to prove that the Grocery's inventory upon his departure was $9,440.58 greater than it was when he came into possession of the store. He reached this figure by subtracting the total cost of goods sold--$35,984.16, from his total purchases of gas and food items--$45,424.74.

## Damages sought by the Parties

¶8. The Theobalds are seeking to recover $10,000, this being the difference between the $175,000 amount in the Note, minus the $160,000 sale of the Grocery to Ms. Jacks and the $5,000 already paid by the Nossers to the Theobalds. They are also seeking to recover attorney fees in the amount of $3,966.50. Additionally, Mr. Theobald testified that he incurred the following incidental damages, totaling $6,503.10, because of the Nossers alleged breach:

$200.00--cleaning the store after the Nossers' departure

$3,810.00--the mortgage note on the store from March to May, 1997

$335.52-- pro-rated insurance on the store

$90.90--alarm service for April

$234.50-- repair of a blown circuit in the store

$200.00-- yard maintenance outside of the store

$35.00-- service truck for gas and supplies

$60.00-- contract labor for restocking

$1,280.00--replacement of spoiled products

$66.29--past due phone bill incurred but not paid for by the Nossers

$190.89--the cost of keeping the Grocery's electricity on from the time the Nossers vacated until the time the Theobalds sold the store to Ms. Jacks

¶9. Finally, the Theobalds are seeking to recover $1,783.65, representing three (3) months mortgage payments on their home. The Theobalds paid off their home mortgage with the proceeds from the May, 1997, sale of the Grocery to Ms. Jacks, and they argue that had the Nossers paid the amount due on the Note in a timely manner, the Theobalds would have paid their home mortgage off in March, not May. Therefore, the Theobalds argue that they incurred three (3) extra notes on their home, and they seek to recover the sum of those notes.

¶10. The Nossers seek damages under the theory that the Theobalds were unjustly enriched with the $9,440.58 worth of additional inventory as well as the $1,851.86 worth of improvements they made to and left in the Grocery.

¶11. As previously stated, Mr. Nosser paid Mr. Theobald $5,000 in early April, 1997, for what Mr. Nosser described as "the use of the store." Mr. Theobald paid the $1,270 monthly note on the Grocery in March and April 1997, said payments totaling $2,540. The Nossers are also seeking $2,460 damages, constituting the difference between $5,000 and $2,540, or, as they put it, "unused rent."

¶12. The chancery court held that there was a valid contract between the parties; the Nossers breached the contract; both parties sustained damages; the damages of each party offset the others; and each party was responsible for their own attorneys fees. Aggrieved by this judgment, both parties have appealed to this Court seeking relief. Judgment was entered accordingly. Although the parties have collectively raised eight (8) separate assignments of error, the issues before this Court can be summarized into two (2) categories: (1) was there a contract and breach thereof; (2) if so, what damages resulted from said breach?

## III. LEGAL ANALYSIS

¶13. In Mississippi, the standard of review for factual determinations made by a trial judge sitting without a jury is the substantial evidence standard. *Hill v. Thompson*, 564 So.2d 1, 10 (Miss.1989). We will not disturb the findings of a chancellor when supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong, clearly erroneous or an erroneous legal standard was applied. *Herring Gas Co. v. Whiddon*, 616 So.2d 892, 894 (Miss.1993).

### A. Was there a contract between the parties; and, if so, was it breached?

¶14. The Statute of Frauds dealing with the sale of land states, in pertinent part, "[a]n action shall not be brought whereby to charge a defendant or other party upon any contract for the sale of lands, tenements, or hereditaments unless, the promise or agreement upon which such action may be brought, *or some memorandum or note thereof*, shall be in writing, and signed by the party to be charged therewith." Miss. Code Ann. § 15-3-1 (c) 1972. (emphasis added). "Sale contract must describe land with reasonable certainty."*Taylor v. Sayle*, 140 So. 3 (Miss. 1932). The Promissory Note will satisfy the Statute of Frauds as a "memorandum or note" of any agreement that the parties may have had, and because the Grocery is described both by name and physical address, the land is described with reasonable certainty.

¶15. "All that is needed to constitute a valid consideration to support an agreement or contract is that there must be either a benefit to the promissor or a detriment to the promisee. If either of these requirements exist, there is a sufficient consideration." *American Olean Title Co. v. Morton*, 247 Miss. 886, 893, 157 So.2d 788, 790 (1963). The Theobalds were promisees in the Note, and they gave up possession of the Grocery as well as the opportunity to sell it to other buyers. These actions are sufficient to constitute adequate consideration for the Note.

¶16. The Nossers argue that they should not be bound by the Note since they did not sign as makers. Although there appear to be no Mississippi cases addressing this issue, other jurisdictions have found this argument to be unpersuasive. The U.S. Court of Appeals for the Eighth Circuit held, in reference to the signature needed to satisfy a Statute of Frauds, that "[it] may take many forms and be located anywhere in the writing, so long as it conveys an intention to authenticate the writing." *Vess Beverages, Inc. v. The Paddington Corp.*, 886 F.2d 208, 213 (8th Cir. 1989). Similarly, the Michigan Supreme Court held "[t]he writing of his name at the top, in the body, or at the bottom of the instrument constitutes a sufficient signing or signature if it is written for the purpose of giving authenticity to the instrument." *Borkowski v. Kolodziejski*, 52 N.W.2d 348, 350 (Mich. 1952) (quoting 49 Am.Jur. 681). These cases state that the intent of the parties, rather than the location of their signatures on an instrument, should be controlling. Because this is the proper inquiry in a situation such as the one at hand, we must now turn to the Note itself and from it, attempt to determine the intent of the Theobalds and Nossers.

¶17. "Where the intentions of the parties to an instrument appear clear and unambiguous from the instrument itself, the court should look solely to the instrument and give same effect as written." ***Barnett v. Getty Oil Co.***, 266 So.2d 581, 586 (Miss. 1972). "A construction leading to an absurd, harsh or unreasonable result in a contract should be avoided, unless the terms are express and free of doubt." ***Frazier v. Northeast Miss. Shopping Ctr., Inc.***, 458 So.2d 1051, 1054 (Miss. 1984). Because the Theobalds signed the Note as Makers and the Nossers signed the Note as Guarantors, a literal reading of it would state as follows: "We, the Theobalds promise to pay ourselves $175,000 in order to purchase a store which we already own; and if we fail to pay ourselves, then the Nossers guarantee to pay us." Such a literal reading would obviously be absurd.

> [A]mbiguous words and terms should be construed against the party who has drafted them; and we accept that, in a case where *language of an otherwise enforceable contract is subject to more than one fair reading*, we will give that language the reading most favorable to the non-drafting party.

***Leach v. Tingle***, 586 So.2d 799, 801-02 (Miss. 1991) (emphasis added).

¶18. The Nossers argue that construing this agreement against the Theobalds renders the Promissory Note contingent upon the Nossers' obtaining financing. This argument, however, has a significant shortcoming, as the Note in this case says nothing about the purchase being contingent on the securing of financing. Consequently, there is no language regarding financing that is "subject to more than one fair reading" which could be construed against the Theobalds.

¶19. "If...a careful reading of the instrument reveals it to be less than clear, definite, explicit, harmonious in all its provisions, and free from ambiguity throughout, the court is obligated to pursue the intent of the parties, and, to determine the intent, must resort to extrinsic aid." ***Barnett***, 266 So.2d at 586. As the Note is the only written instrument in the record regarding the purposed sale of the Grocery, the only probative extrinsic evidence remaining is the acts of the parties themselves. If, as the Nossers claim, the sale of the Grocery was contingent on their ability to obtain financing, then the Theobalds would have been aware of the possibility of them having to take back the store and immediately re-commencing operations. Assuming such circumstances to be true, then it is hard to believe that they would have closed their business bank account, given up their tax ID number (and their ability to buy food and gas at wholesale prices), and let the Nossers do whatever they wanted to the Grocery without their input or supervision.

¶20. Furthermore, it seems unlikely that the Nossers would have expended over $1,800 on fixtures which they would not have been able to recover had they been forced to vacate the Grocery for failure to complete the sale. Continuing under this same assumption, then it would seem logical to have included language in the Note stating things like the sale was contingent on financing, how much time the Nossers would have to attempt to obtain financing, and what "rent" would be owed to the Theobalds if the Nossers occupied the grocery for only a brief period of time. As mentioned above, no such language was included in the Note. Since Mr. Nosser thought to insert the description of the property in the Note, then it seems that he would have also thought to insert some "contingency upon financing" language, if that was truly his arrangement with Mr. Theobald. "[I]f a party who contemplates purchasing a piece of property wishes to protect himself against the possibility that he may be unable to secure financing adequate to make the purchase, it is incumbent upon that party to so provide by clear language in the contract." ***Osborne v. Bullins***, 549 So.2d 1337, 1339 (Miss. 1989). "[I]n the absence of some provision in the contract

authorizing termination or cancellation, every contract is presumed irrevocable." ***Warwick v. Matheney***, 603 So.2d 330, 336 (Miss. 1992) (quoting 17A C.J.S. *Contracts*, § 397). The only act, or lack thereof, that might suggest that the sale of the Grocery was contingent on financing is that the Theobalds never deeded the Grocery to the Nossers. However, this is but one fact, and all of the parties' actions taken as a whole point to the conclusion that the sale of the Grocery was not contingent on the Nossers' ability to obtain financing.

¶21. Therefore, we affirm the Chancellor's holding that a valid, unconditional contract existed between the Theobalds and the Nossers, said contract having been breached by the Nossers when they failed to satisfy the Note on its due date, March 31, 1997. Having determined that a contract did exist and was breached, we must now examine what damages flowed from this breach.

## B. What damages are each of the parties entitled to

## because of the breach of the contract?

¶22. "The court's purpose in establishing a measure of damages for breach of contract is to put the injured party in the position where she would have been but for the breach." ***Leard v. Breland***, 514 So.2d 778, 782 (Miss.1987). "Contract damages are ordinarily based on the injured party's expectation interest and are intended to give him the benefit of the bargain by awarding him a sum of money that will, to the extent possible, put him in as good a position as he would have been in had the contract been performed." ***J.O. Hooker & Sons, Inc. v. Roberts Cabinet Co.***, 683 So.2d 396, 405 (Miss. 1996) (quoting 22 Am.Jur.2d *Damages* § 45).

¶23. In addressing damages, the chancery court held that both parties suffered damages, the damages of each party offset the others and each party was responsible for their attorney fees.

¶24. But for the Nossers' breach, the Theobalds would have received $175,000 for the sale of their Grocery. However, the Nossers did breach, and the Theobalds subsequently received only $160,000 for their Grocery. The Nossers have already paid $5,000 on the Note, and it will take another $10,000 to put the Theobalds in the same position in which they would have been absent a breach. Accordingly, the Theobalds are entitled to recover the $10,000 which they seek.

¶25. The Theobalds seek to recover their attorney fees of $3,966.50 from the Nossers under paragraph four (4) of the Note, which provides "[i]f this Note is not paid promptly in accordance with its terms, the Undersigned agrees to pay all costs of collection, including reasonable attorney fees." "Of course, parties may by contract provide that in event of dispute, the losing party must pay the winner attorney's fees." ***Grisham v. Hinton***, 490 So.2d 1201, 1206 (Miss. 1986). The Nossers failed to dispute the reasonableness of the aforementioned attorney fees either at trial or in their brief to this Court, and absent objection, it must be assumed that said fees are reasonable. The chancery court apparently held that, notwithstanding paragraph four (4) of the Note, the Theobalds should pay their own attorney fees because "[t]his action was brought regarding the basic validity of the Note. This was a genuine factual issue which could not have been resolved without this Court's determination." No cases have been cited by either the Chancery court or the parties which support such a holding, and this Court has been unable to find any cases supporting such a position. As evidenced by ***Grisham***, a clause in a contract such as the one in paragraph four (4) of our Note is certainly reasonable. However, enforcing this Note without enforcing the clause addressing attorney fees would be contrary to the law. Accordingly, the Theobalds are entitled to

recover $3,966.50 in attorney fees.

¶26. The Theobalds claim that they incurred numerous costs once the Nossers vacated the Grocery totaling $6,503.10. The Theobalds assert that these expenditures were necessary in getting the Grocery ready for re-sale, and they included repairs, cleaning, restocking, payment of past due bills, and the notes on the store. The Chancellor awarded the Theobalds $2,358.60 worth of the aforementioned costs, declining to award the three (3) months worth of notes on the Grocery as well as the cost of replacing a circuit in the Grocery. Allowing the Theobalds to recover the three (3) months worth of notes as well as the sales proceeds from which those notes would have been paid would amount to double recovery; and therefore, the Chancellor was correct in not allowing said damages. Although it in not clear from the record why the Chancellor declined to award the cost of replacing the circuit in the Grocery, there is no substantial evidence pointing to the conclusion that such a ruling was manifest error. The Chancellor did, however, make a mathematical mistake in her computation of these damages. The Court allowed $100 in damages for yard maintenance outside of the store, when in fact, Mr. Theobald testified that he spent $100 on two (2) different occasions for said maintenance. Therefore, the Chancellor's award of $2,358.60 to the Theobalds for incidental damages shall be increased to $2,458.60.

¶27. Finally, the Theobalds are seeking to recover $1,783.65, this sum representing three (3) months worth of mortgage notes on their home. They paid off their home mortgage with the sale proceeds, and they claim that they were forced to make three (3) extra mortgage payments on their home because the Nossers did not pay the Grocery Store Promissory Note on time. However, they can not recover the three (3) months worth of home mortgage notes for the same reason that they can not recover the three (3) extra store notes.

¶28. Although there is credible evidence in the record that the Nossers added $9,440.58 worth of additional inventory and $1,851.86 worth of improvements to the Grocery, they are not entitled to recover these amounts as damages for unjust enrichment. Had the Nossers not increased the value of the Grocery by the aforementioned $11,292.44, it is reasonable to assume that Ms. Jacks would have paid approximately $11,292.44 less than what she actually paid when she bought the Grocery. In other words, the extra inventory and improvements were sold for part of the $160,000 paid by Ms. Jacks; therefore, the Nossers have already been compensated for the improvements they made to the Grocery, as this $160,000 has already been credited to them.

¶29. Additionally, the Nossers seek to recover $2,460, the difference in the $5,000 they paid the Theobalds in early April and $2,540, the total of the Grocery's mortgage notes which were paid by the Theobalds while the Nossers occupied the store. The Nossers claim that this $2,460 represents "unused rent" to which they are entitled to recover. However, the initial award of $10,000 to the Theobalds gives the Nossers full credit for the $5,000 that they paid the Theobalds in early April, 1997. Awarding the Nossers the $2,460 they now seek would amount to a double recovery, therefore, they are not entitled to said recovery.

## IV. CONCLUSION

¶30. We hold that there is substantial evidence supporting the Chancellor's finding that a non-contingent contract for the sale of the Eagle Lake Grocery and Deli existed between the Theobalds and Nossers, the Nossers having breached the contract with their failure to satisfy the Promissory Note on its due date. However, it was error for the Chancellor to hold that each sides' damages offset the others, and that the Theobalds were responsible for their attorney's fees. The Theobalds should be awarded a total of $16,

425.10, consisting of (1) $10,000 to put them in the position they would have been in if there would have been no breach, (2) $3,966.50 attorney's fees, as provided for under the Note, and (3) $2,458.60 incidental damages incurred in preparing the Grocery for re-sale. Although the Nossers did make improvements to the Grocery while the operated it, they are not entitled to recover the value of said improvements, as the improvements were sold, along with the rest of the Grocery, for $160,000. For the foregoing reasons, we affirm in part and reverse and render in part the judgment of the Warren County Chancery Court, and remand this case back to said court for entry of judgment of $16,425.10 in favor of the Theobalds.

¶31. **AFFIRMED IN PART, REVERSED, RENDERED, AND REMANDED IN PART.**

**SULLIVAN AND PITTMAN, P.JJ., BANKS, McRAE, SMITH, MILLS, WALLER AND COBB, JJ., CONCUR.**