# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2002-CA-00096-SCT

*CLINTON GRICE ROTENBERRY, JR.*

*v.*

*SCOTTYE R. HOOKER*

DATE OF JUDGMENT:                12/20/2001
TRIAL JUDGE:                     HON. DENISE OWENS
COURT FROM WHICH APPEALED:    HINDS COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:       VAUGHN DAVIS
ATTORNEY FOR APPELLEE:        DANA J. SWAN
NATURE OF THE CASE:           CIVIL - CONTRACT
DISPOSITION:                   AFFIRMED - 11/06/2003
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC.**

**WALLER, JUSTICE, FOR THE COURT:**

¶1.     Scottye R. Hooker and Clinton Grice Rotenberry, Jr., were sole and equal beneficiaries of a trust. Hooker made an offer to sell Rotenberry her one-half interest in a farm held by the trust. Rotenberry accepted the offer, but Hooker rejected the acceptance because of a perceived misconstruction of the offer. Rotenberry's claim for specific performance was denied because the chancery court found that there was never an agreement with regard to the contract price and a unilateral mistake permitted recission of the contract. We find that the chancellor was not manifestly wrong in finding unilateral mistake which warranted rescission of the contract.

## FACTS

¶2. Clinton Gilliam Rotenberry established a trust, the corpus of which consisted of farm land, bank stocks, and other accounts. The trust provided for distribution to the remainder beneficiaries, Clinton G. Rotenberry, Jr., and Scottye R. Hooker, upon the death of the last remaining income beneficiary. The last remaining income beneficiary died in 1997. At the time of termination, the trust's corpus consisted of Trustmark bank stock, various bank accounts, a leasehold interest in two lots on the reservoir, a judgment entered against a prior trustee, several policies of life insurance, and a 3,262 acre farm in Panola and Tallahatchie Counties.

¶3. The farm is the asset at issue in this litigation. Rotenberry and Hooker each had a one-half interest in the remainder assets. A prior trustee had borrowed money from the Met Life Company and had given a deed of trust on the farmland to secure the indebtedness. This debt had a balance of $459,000 at the time of the termination of the trust,

¶4. Upon termination, the trustee began preparing for distribution of the assets. Efforts were made to distribute separate assets to Rotenberry and Hooker. Rotenberry made it known that he was interested in purchasing Hooker's portion of the farmland. The trustee had been able to collect $150,000 a year from leasing the farmland. If Rotenberry and Hooker were unable to reach an agreement on the 3,262 acres, then the trustee was prepared to partition the property, with the result being that each would take one-half of the property and each would assume one-half of the Met Life debt.

¶5. On December 2, 1998, Patrick H. Johnson, as attorney for Hooker, communicated an offer to sell her interest in the farmland to Rotenberry's attorney. The letter specifically stated, "Earlier today I spoke with Scottye and she authorized me to offer to sell to Clint her undivided one-half interest in the 3,262 acres of the Panola and Tallahatchie County farm land for $1,062,500 less the balance of the debt due Met Life." The offer made "time of the essence" and allowed only one day for acceptance.

¶6.     On December 3, 1998, Rotenberry authorized his attorney to accept the offer.  His offer was communicated by letter transmitted by facsimile which stated, "I am authorized by Clint to accept and do hereby accept the offer of Scottye Hooker to sell to Clint her undivided one-half interest in the 3,262 acres of the Panola and Tallahatchie County farm land for $1,062,500 less the balance of the debt due Met Life."

¶7.     On December 7, 1998, Rotenberry, through his attorney, sent a second letter to Hooker's counsel stating that he was willing to place $100,000 in escrow pending the completion of the sale if Hooker would sign a document authorizing Rotenberry to enter into a farm lease pending the closing.  The farm lease from the preceding year had expired, and Hooker was attempting to secure a new farm lease to ensure the land would continue to be active and income producing.

¶8.     On December 9, 1998, Rotenberry, through his attorney, sent a third letter to Hooker's counsel stating he was immediately ready to tender the sum of $603,500.00 ($1,062,500.00 less the $459,000.00 balance due on the Met Life debt) to finalize the transaction.  This letter brought an immediate response from Hooker's attorney who considered the assessment of all of the debt instead of one-half as a counteroffer and rejected the same.  The December 9 letter stated:

> It was my client's intent on December 3, 1998, as it has been over the last several months of negotiations, to establish a price for her interest in the farmland and to proceed from there with negotiating the remainder of the transaction once the offer was accepted . . . . The facts and pattern of conduct state a very clear and convincing case that this sale was and continued up to this point to be in the process of negotiation and had never been finalized . . . .  Your client's December 9, 1998 offer to purchase Scottye's one half undivided interest less the total on the entire piece of property rather than the debt attributable to her one half interest flies in the face of equity and is totally unacceptable and is hereby rejected.

Rotenberry's attorney disagreed with this assessment and responded with a letter dated December 9, 1998, indicating a deal was struck and he was ready to perform.  This letter stated:

3

You attempt to characterize my earlier letter of December 9, 1998, as a new offer but it obviously is not. It is merely a letter tendering full payment of the purchase price which had been agreed to in prior written communications between us which were authorized and approved by our clients. . . . [T]he original offer by your client was not for $1,062,500 less one half of the debt due to Met Life but was for the amount 'less the balance of the debt due Met Life' This offer has been made by your client and accepted by mine. It only remains to be fulfilled by both of our clients and, as I have informed you, my client stands ready to perform.

¶9. Rotenberry thereafter filed a complaint seeking specific performance. A bench trial was held in which testimony was heard from only two witnesses, the attorneys who represented the parties at the time of the alleged offer and the alleged acceptance. The chancellor denied Rotenberry's request for specific performance and found that there was no meeting of the minds regarding the amount of Met Life debt to be deducted. She then applied the doctrine of unilateral mistake and rescinded the contract.

**STANDARD OF REVIEW**

¶10. The initial question of whether a contract is ambiguous is a matter of law. *Lamb Constr. Co. v. Town of Renova*, 573 So. 2d 1378, 1383 (Miss. 1990). If found ambiguous, the subsequent interpretation of the contract is a finding of fact. *Id*. We will uphold a chancellor's findings of facts unless they are manifestly wrong or against the overwhelming weight of the evidence. *Richardson v. Riley*, 355 So. 2d 667, 668 (Miss. 1978).

**DISCUSSION**

> **I.     WHETHER THE CHANCERY COURT ERRED BY FINDING THAT THERE HAD BEEN NO MEETING OF THE MINDS OF THE PARTIES.**

¶11. Rotenberry argues that Hooker is procedurally barred from raising the issue of ambiguity because she failed to plead ambiguity in the trial court. He also asserts that the chancellor erred by finding there was

4

no meeting of the minds regarding the amount of Met Life debt to be deducted from the price stated in Hooker's offer.

¶12. The argument that Hooker is barred from raising the issue of contract ambiguity because of a procedural bar is without merit. We have held that "ambiguity is not a defense that one must affirmatively set forth." *Century 21 Deep South Props., Ltd. v. Keys*, 652 So. 2d 707, 717 (Miss. 1995). "Ambiguity analysis, unlike affirmative defense analysis, is by its very nature a necessary step in the examination of every contract." *Id.* at 717. While not explicitly set out as an affirmative defense, Hooker did, on the first page of her answer, state, "The offer is ambiguous in that the term 'the debt' is a broad reference at best which could be construed and interpreted several different ways."

¶13. Rotenberry argues that the chancellor erred in finding there was no meeting of the minds as to the price in the agreement and allowing extrinsic evidence. We agree. The elements of a valid contract are: "(1) two or more contracting parties, (2) consideration, (3) an agreement that is sufficiently definite, (4) parties with legal capacity to make a contract, (5) mutual assent, and (6) no legal prohibition precluding contract formation." *Lanier v. State*, 635 So. 2d 813, 826 (Miss. 1994). A contract is unenforceable if the material terms are not sufficiently definite. *Leach v. Tingle*, 586 So. 2d 799, 802 (Miss. 1991). Price is an essential term that must be stated with specificity. *Id*. at 803. The contract fails when the price has not been stated with specificity. *Id*.

¶14. When examining a contract, a court should first examine the four corners of the contract to determine how to interpret it. *McKee v. McKee*, 568 So. 2d 262, 266 (Miss. 1990). If the language in the contract is clear and unambiguous the intent of the contract must be effectuated. *Pfisterer v. Noble*, 320 So. 2d 383, 384 (Miss. 1975) *See also Pursue Energy Corp. v. Perkins*, 558 So. 2d

5

349, 352 (Miss. 1990). Vagueness and ambiguity are more strongly construed against the party drafting the contract. *Lamb Constr. Co. v. Town of Renova*, 573 So. 2d at 1383. Only when the intent of the parties is not clear the Court should then resort to extrinsic evidence. *Perkins,* 558 So. 2d. at 353. Hooker's original letter which offered to sell her half of the farm states "the price less the amount due Met Life." Nowhere in the letter does it indicate Hooker would only pay one-half of the amount owed Met Life. Since the letter was clear and unambiguous the chancellor should not have looked outside its four corners to determine the parties' intentions.[1] Once accepted by Rotenberry, Hooker's letter offering to sell her interest in the land created a valid agreement.

## II. WHETHER THE CHANCELLOR ERRED BY FINDING THAT THE DOCTRINE OF UNILATERAL MISTAKE REQUIRES THE CONTRACT TO BE RESCINDED.

¶15. Rotenberry argues that the chancellor erred in finding that Hooker was entitled to recission of the contract due to unilateral mistake. He claims that Hooker is barred from raising the issue of unilateral mistake on appeal because she failed to raise the issue in the trial court, and that the evidence does not support a finding of unilateral mistake. We do not agree.

¶16. While Hooker did not assert unilateral mistake in her pleadings, the chancellor made specific findings in resolving the issue. Therefore we are not limited in our review of the issue. *See Boutwell v. Merritt*, 232 Miss. 811, 100 So. 2d 604, 815 (1958).

¶17. We hold that the chancellor's finding of unilateral mistake was not manifestly wrong. In Mississippi, equity will prevent an intolerable injustice such as where a party has gained an unconscionable advantage by mistake and the mistaken party is not grossly negligent:

---

[1] Contrary to Presiding Justice McRae's dissent, we find the agreement clear and unambiguous.

6

> But where the mistake is of so fundamental a character, that the minds of the parties have never, in fact, met; or **where an unconscionable advantage has been gained**, by **mere mistake** or misapprehension; and there was no *gross negligence* on the part of the plaintiff, either in falling into the error, or in not sooner claiming redress; and no intervening rights have accrued; and the parties may still be placed *in statu quo*; **equity will interfere, in its discretion, in order to prevent intolerable injustice**. This is the clearly defined and well established rule upon the subject, in courts of equity, both in England and America.

*Miss. State Building Comm'n v. Becknell*, 329 So. 2d 57, 60-61 (Miss. 1976) (quoting *State Highway Comm'n v. State Constr. Co.*, 203 Or. 414, 280 P.2d 370, 380 (1955) (italics in original & boldface added).

¶18.    The chancellor reviewed the dealings between the parties and found that neither party had an obligation to pay any more than one-half of the debt.  As the chancellor noted, "[i]f the parties could not agree upon a tenant to lease the property in order to keep the property active and producing income, in which both parties would be entitled to share equally in the profits, then why would [Hooker] agree to sell her interest less the debt to be deducted from the asking price."  It is simply counterintuitive to think that Hooker would knowingly and consciously sell her one-half interest in the farmland less the amount of the *entire* debt when she was only obligated to pay one-half of it.  A mistake to the tune of $230,000 bestows an "unconscionable advantage" upon Rotenberry.

¶19.    There is no evidence that Hooker was negligent.  She contacted Rotenberry as soon as she realized he had seized upon an obvious error.   No intervening rights have accrued, no escrow was paid or accepted and the parties never changed the positions they held before Hooker's offer.  The chancellor recognized the fundamental injustice of holding Hooker to such an obligation.  As such, her findings were not manifestly erroneous.

7

**CONCLUSION**

¶20.    Although the chancellor erred in allowing extrinsic evidence to determine that the parties did not agree to the amount to be deducted from the price in the agreement, we find that the chancellor did not abuse her discretion in finding that unilateral mistake entitled Hooker to rescind the contract. The chancellor's judgment is affirmed.

¶21.    **AFFIRMED.**

      **PITTMAN, C.J., SMITH, P.J., EASLEY, CARLSON AND GRAVES, JJ., CONCUR. McRAE, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION. COBB AND DIAZ, JJ., NOT PARTICIPATING.**

      **McRAE, PRESIDING JUSTICE, DISSENTING:**

¶22.    The majority erroneously finds that Clinton Grice Rotenberry, Jr. ("Clint") is not entitled to specific performance of an agreement between himself and his sister Scottye R. Hooker ("Scottye"), wherein Scottye agreed to sale Clint her one half of the interest in certain farmland which had been held in trust for their benefit and distributed upon the death of the last remaining income beneficiary.  The facts and applicable law on this subject support a finding that a valid agreement between Scottye and Clint existed for the sale of the farm interest and specific performance of this agreement is the equitable and appropriate remedy.  For these reasons, I dissent.

¶23.    In order to fully understand the agreements between Scottye and Clint concerning the sale of the farm interest; the following facts must be recited:

      (1)      Patrick H. Johnson ("Pete"), as attorney for Scottye, communicated an offer to sell her interest in the farmland to Clint's attorney.  The letter specifically stated:
                  "Earlier today I spoke with Scottye and **she authorized me to offer to sell to Clint her undivided one-half interest in the 3,262 acres of the Panola and Tallahatchie County farm land for**

8

> **$1,062,500 less the balance of the debt due Met Life."** (emphasis added).

The offer made "time of the essence" and allowed only one day for acceptance.

(2)     Thereafter, Clint authorized his attorney to accept the offer. His offer was communicated by letter transmitted by facsimile. The letter specifically stated:

> I am **authorized by Clint to accept and do hereby accept the offer of Scottye Hooker to sell to Clint her undivided one-half interest in the 3,262 acres of the Panola and Tallahatchie County farm land for $1,062,500 less the balance of the debt due Met Life.**

(emphasis added).

(3)     Pressured by the necessity to execute a lease upon the farm land; Clint, through his attorney, sent a letter to Scottye's counsel stating that he was willing to place $100,000 in escrow pending the completion of the sale, if Scottye would sign a document authorizing Clint to enter into a farm lease pending the closing. The farm lease from the proceeding year had expired and Clint was attempting to secure a new farm lease to ensure the land would continue to be active and income producing.

(4)     Clint, through his attorney, sent another letter to Scottye's counsel communicated he was immediately ready to tender the sum of $603,500.00 ($1,062,500.00 less the $459,000.00 balance due on the Met Life debt) to finalize the transaction.

(5)     This letter brought an immediate response from Pete, Scottye's attorney. Pete stated:

> It was may client's intent on December 3, 1998, as it has been over the last several months of negotiations, to establish a price for her interest in the farmland and to proceed from there with negotiating the remainder of the transaction once the offer was accepted . . . The facts and pattern of conduct state a very clear and convincing case that this sale was and continued up to this point to be in the process of negotiation and had never been finalized . . . Your client's December 9, 1998 offer to purchase Scottye's one half undivided interest less the total on the entire price of property rather than the debt attributable to her one half interest flies in the face of equity and is totally unacceptable and is hereby rejected.

(6)     Clint's attorney responded stating that:

You attempt to characterize my earlier letter of December 9, 1998, as a new offer but it obviously is not. It is merely a letter tendering full payment of the purchase

9

price which had been agreed to in prior written communications between us which were authorized and approved by our clients . . . [T]he original offer by your client was not for $1,062,500 less one half of the debt due to Met Life but was for the amount 'less the balance of the debt due Met Life' This offer has been made by your client and accepted by mine. It only remains to be fulfilled by both of our clients and, as I have informed you, my client stands ready to perform.

(7)     Following the collapse of all negotiations to finalize the sale, Clint filed a complaint seeking specific performance.

(8)     A bench trial was held in which testimony was heard from only two witnesses, the attorneys who represented the parties at the time of the alleged offer and the alleged acceptance. The testimony revealed that Pete, Scottye's attorney and her sole witness, had a vested interest in the outcome of the proceeding. Pete, along with his law partner, had acquired title to the hunting and fishing rights to Scottye's half of the property. She owed him legal fees for past services and instead of paying for those services transferred title to the hunting and fishing rights to her half of the land. Additionally, evidence presented showed that an appraisal of the property had determined the entire 3, 262 acres to be worth $2,031,000.

(9)     Ultimately, the Chancellor entered a Final Order denying Clint's request for specific performance and finding ambiguity and a unilateral mistake entitling Scottye to rescission of the contract.

¶24.    Under the applicable rules of contract construction, the doctrine of unilateral mistake, and the law regarding specific performance, a binding agreement between Scottye and Clint existed for which specific performance is an appropriate and equitable remedy.

I.     **UNDER THE APPLICABLE RULES OF CONTRACT LAW, THE CONTRACT IS UNAMBIGUOUS, PRECLUDING THE ADMISSION OF PAROL EVIDENCE AND ENTITLING CLINTON G. ROTENBERRY, JR. TO SPECIFIC PERFORMANCE.**

¶25.    "A valid contract must include the following essential elements: "(1) two or more contracting parties, (2) consideration, (3) an agreement that is sufficiently definite, (4) parties with legal capacity to make a contract, (5) mutual assent, and (6) no legal prohibition precluding contract formation." *Lanier v. State*, 635 So.2d 813, 826 (Miss. 1994); *Hunt v. Coker*, 741 So.2d 1011, 1015 (Miss. Ct. App. 1999). "It

10

is a well-established rule that to make a contract by correspondence . . . one must make a proposition and the other accept the same as made; in other words, the minds of the parties must meet upon a definitive proposition and its acceptance as made." ***Hollister v. Frellsen***, 148 Miss. 568, 114 So. 385, 386 (1927). A contract becomes binding and enforceable upon the acceptance of the offer. ***Edwards v. Wurstler Oil Co.***, 688 So.2d 772, 775 (Miss. 1997) (citing ***Sweet Home Water & Sewer Ass'n v. Lexington Estates, Ltd.*** 613 So.2d 864, 871 (Miss. 1993); ***Houston Dairy Inc. v. John Hancock Mut. Life Ins. Co.***, 643 F.2d 1185, 1186 (5th Cir. 1981); ***Williams v. Favret***, 161 F.2d 822, 824 (5th Cir. 1947)). A contract is sufficiently definite "if it contains matters which would enable the court under proper rules of construction to ascertain its terms." ***Leach v. Tingle***, 586 So.2d 799, 802 (Miss. 1991); ***Hunt***, 741 So.2d at 1014.

¶26.     Here, it is clear that a contract formation did occur. Scottye offered and Clint accepted. His acceptance cited her offer word for word. The offer and acceptance included all the essential elements to a contract. There were two parties, Scottye and Clint. Consideration of "$1,062,500 less the balance of the Met Life debt" was stated in both the offer and acceptance. The agreement stated the land to be sold, the purchase price, the parties, and even made "time of the essence." Both Scottye and Clint have legal capacity to contract. They mutually assented to the offer. There are no legal prohibitions precluding the land sale contract.

¶27.     Scottye argues, and the majority finds, that there was no meeting of the minds "since she didn't mean what was written." Such a finding is without merit. Scottye was careful in her land sale offer. She even hired an attorney to make the offer and complete the transaction. Her attorney even testified that Scottye is the one who set the price. He also acknowledged that the hunting and fishing rights he acquired

11

from Scottye were worth more than the legal bills owed to him. Further, he testified that Scottye required no appraisal or expert advice before she agreed to convey him the hunting and fishing rights.

¶28.    Also, the majority holds that the chancellor correctly found that the contract was ambiguous. The Court's analysis when confronted with the interpretation of a contract is three tiered. "First, the court will attempt to ascertain intent by examining the language contained within the 'four corners' of the instrument in dispute." *Pursue Energy Corp. v. Perkins*, 558 So.2d 349, 352 (Miss. 1990) (citing *Pfisterer v. Noble,* 320 So.2d 383, 384 (Miss. 1975)). *See also **Thornhill v. System Fuels, Inc.***, 523 So.2d 983, 998 (Miss. 1988) (holding that it is the duty of a court to construe an instrument as written). Second, "[i]f examination solely of the language within the instrument's four corners does not yield a clear understanding of the parties' intent, the court will [implement] . . . applicable 'canons' of construction." *Pursue Energy Corp.*, 558 So.2d at 352 citing *Clark v. Carter*, 351 So.2d 1333, 1334 & 1336 (Miss. 1977). *See also **St. Regis Pulp & Paper Co. v. Floyd***, 238 So.2d 740, 744 (Miss. 1970) (holding the court should give great weight to the writing in the instrument when determining intent)). Third, "if intent remains unascertainable (i.e., the instrument is still considered ambiguous), then the court may resort to [the] . . . consideration of extrinsic or parol evidence." *Pursue Energy Corp.*, 558 So.2d at 353.

## A.  FOUR CORNERS OF THE INSTRUMENT

¶29. The goal of the court is to give effect to the intention of the parties. "The general rule is the intention of the parties must be drawn from the words of the whole contract, and if, viewing the language used, it is clear and explicit, then the court must give effect to this contract unless it contravenes public policy." *Jones v. Mississippi Farms Co.*, 116 Miss. 295, 76 So. 880, 884 (1917). "One should look to the 'four corners' of the contract whenever possible to determine how to interpret it." *Warwick v. Gautier Util.*

12

***Dist.***, 738 So.2d 212, 214 (Miss. 1999 ) (citing ***McKee v. McKee***, 568 So.2d 262, 266 (Miss. 1990)).

"'Therefore, when interpreting a contract, the court's concern is not nearly so much with what the parties may have intended but with what they said, since the words employed are by far the best resource for ascertaining the intent and assigning meaning with fairness and accuracy.' " ***Id.*** (quoting ***Simmons v. Bank of Miss.***, 593 So.2d 40, 42-43 (Miss. 1992)). Contracts must be interpreted by objective, not subjective standards, therefore "[c]ourts must ascertain the meaning of the language actually used, and not 'some possible but unexpressed intent of the parties.' " ***IP Timberlands Operating Co. v. Denmiss Corp.***, 726 So.2d 96, 105 (Miss. 1998) (quoting ***Cherry v. Anthony, Gibbs, Sage***, 501 So.2d 416, 416 (Miss. 1987)). The parties disagreement over the meaning of a word of provision, alone, does not render an instrument ambiguous. ***IP Timberlands Operating Co., Ltd.***, 726 So.2d at 105 (citing ***Whittington v. Whittington***, 608 So.2d 1274, 1278 (Miss. 1992)).

¶30.    When interpreting the written language of a contract the court should apply " 'correct English definition[s] and language usage.'" ***Pursue Energy Corp.***, 558 So.2d at 352 (quoting ***Thornhill***, 523 So.2d at 1007 (Robertson, J., concurring in denial of rehearing)) *See also* ***Knox v. Shell Western E & P, Inc.***, 531 So.2d 1181, 1189 (Miss. 1988) (Robertson, J., concurring)). "In other words, an instrument should be construed in a manner 'which makes sense to an intelligent layman familiar only with the basics of English language.' " ***Id.*** (holding a sentence should not be given an artificial 'diagramed' meaning when its idea is reasonably clear') (citing ***Henderson v. State***, 445 So.2d 1364, 1366-68 (Miss. 1984)).

¶31.    Applying these contract principles here leads to the conclusion that the contract between Clint and Scottye is **unambiguous**. The only phrase suggested by Scottye and the chancellor to create ambiguity

is "less the balance due on the Met Life debt." There is nothing ambiguous about this phrase. Scottye argues that "balance" as used means one half of the balance due to Met Life. As was stated earlier "[c]ourts must ascertain the meaning of the language actually used, and not 'some possible but unexpressed intent of the parties.'" *IP Timberlands Operating Co.*, 726 So.2d at 105 (quoting *Cherry*, 501 So.2d at 416). Her present intent may have been for "balance" to mean one half of the balance due to Met Life, but that is not what her offer stated. Her offer stated: "$1,062,500 less the balance due to Met Life." The courts are "concerned with what contracting parties have said to each, not some secret thought of one [that was] not communicated to the other." Quoting *Miss. State Highway Comm'n v. Patterson Enters., Ltd.*, 627 So.2d 261, 263 (Miss. 1993); *Palmere v. Curtis*, 789 So.2d 126, 131 (Miss. Ct. App. 2001).

¶32.    "Balance" is defined to include "the remainder or rest;" "equality between the totals of the two sides of an account;" "the difference between the debit total and the credit total of an account;" and "unpaid difference represented by the excess of debits over credits."   Random House Webster's Unabridged Dictionary 157 (2d ed. 1998).  Under these definition, "balance" does not mean what Scottye is asserting.

¶33.    The Court of Appeals has interpreted the meaning of "may" in reference to a temporary loan requirement to substitute for the equity in the buyer's home that was otherwise necessary for the sale to occur. *Langston v. Taylor*, 766 So.2d 66, 67 (Miss. Ct. App. 2000).  There the court held that "[a]ny ambiguity was resolved in favor of the natural meaning of the use of 'may.'" *Id.*  Therefore, the court held that the purchasers did not breach their purchase agreement by failing to seek the bridge loan. *Id*. at 66. This is similar to the present case. The homeowner in *Langston* meant for "may" to include an obligation for the purchasers to secure a bridge loan, but the court refused to infer that meaning.  Here Scottye asks

14

this Court to infer that "balance" means one half of the balance due Met Life. If she intended that "balance" have that meaning, she should have included that wording in her offer.

¶34. Even applying the legal definition of balance, there can be no reconciliation with what Scottye claims. "Balance" is defined as "[t]o compute the difference between the debits and credits; [t]o equalize in number, force, or effect; or to bring into proportion; [and] [t]o measure competing interests and offset them appropriately." Black's Law Dictionary 111 (7th ed. 2000). Once Clint unequivocally accepted Scottye's offer, the contract was formed and the terms were in place. There is nothing ambiguous about the word "balance." Scottye just made a mistake in the wording of her offer; but the wording itself was not ambiguous. This Court has stated that "equity will not act to rescind a contract where the mistake was induced by the negligence of the party seeking rescission." *Turner v. Terry*, 799 So.2d 25, 36 (Miss. 2001).

¶35. Under the four corners rule, there is no ambiguity, and the contract is clear. "When an instrument's substance is determined to be clear and unambiguous, the parties' intent must be effectuated." *Pursue Energy Corp.*, 558 So.2d at 352 (citing *Pfisterer*, 320 So.2d at 384 (holding that an instrument that is "clear, definite, explicit, harmonious in all its provisions, and is free from ambiguity" must be "given effect.")). Since no ambiguity exists, the contract should be enforced.

### B. CANONS OF CONSTRUCTION

¶36. Even assuming an ambiguity in the contract exists, applying the applicable canons of construction still leads to the conclusion that the contract must be enforced. "Application of 'canons' of construction may provide a court with an objective inference of the parties intent." *Pursue Energy Corp.*, 558 So.2d at 353. One such canon is stated as "uncertainties should be resolved against the party who prepared the instrument." *Id.* at 352 (citing *Clark*, 351 So.2d at 1334-35)). "[I]n a case where

15

language of an otherwise enforceable contract is subject to more than one fair reading, we will give that language the reading most favorable to the non-drafting party." ***Theobald v. Nosser***, 752 So.2d 1036, 1041 (Miss. 1999) (citing ***Leach***, 586 So.2d at 801-02).

¶37.    Scottye's attorney prepared the offer.  Clint accepted the offer and used her exact wording in his acceptance letter.  Scottye's own attorney testified that she set out the asking price, and he merely condensed it to writing.  Any ambiguity as to the meaning of "balance" should be resolved in Clint's favor since he was the non-drafting party.  Applying these principles, the contract should be enforced as written.

## C.  PAROL EVIDENCE

¶38.    The chancellor allowed the testimony of the attorneys who prepared the offer and accepted the offer.  This testimony is parol evidence.  It is a well-settled principle of contract law that parol evidence should never be admitted where the terms of a contract are clear and unambiguous. ***Turner***, 799 So.2d at 32 (citing ***Estate of Parker v. Dorchack***, 673 So.2d 1379, 1392 (Miss. 1996)).  One of the fundamental principles of contract law is that parol evidence will not be received to vary or alter the terms of a written agreement that is intended to express the entire agreement of the parties on the subject matter at hand.  ***Grenada Auto Co. v. Waldrop***, 188 Miss. 468, 471, 195 So. 491, 492 (1940); ***Perrault v. White Sewing Mach. Co.***, 157 Miss. 167, 176, 127 So. 271, 274 (1930); ***Edrington v. Stephens***, 148 Miss. 583, 586, 114 So. 387, 389 (1927); ***Kerr v. Calvit***, 1 Miss. 115, 118 (Miss. 1822); ***Housing Auth., City of Laurel v. Galtin***, 738 So.2d 249, 251 (Miss. Ct. App. 1998).  " 'Parol evidence as to surrounding circumstances and intent may be brought in where the contract is ambiguous, but where . . . the contract [is] found to be unambiguous it has no place' " ***Heritage Cablevision v. New Albany Elec. Power System***, 646 So.2d 1305, 1313 (Miss. 1994) (quoting ***Cherry***, 501 So.2d at 419).

16

Additionally, parol evidence has no place until after the court has looked to the four corners of the contract and the applied the canons of contract construction. *Pursue Energy Corp.*, 558 So.2d at 352); *Martin v. Fly Timber Co.*, 825 So.2d 691, 695 (Miss. Ct. App. 2002). In *Frierson v. Delta Outdoor, Inc.*, 794 So.2d 220, 224 (Miss. 2001) and *Cooper v. Crabb*, 587 So.2d 236, 241 (Miss. 1991), this Court held that the rule against the admissibility of parol evidence when a contract is unambiguous is "not merely a rule of evidence, but is one of substantive law."

¶39.    Here the chancellor's decision was based on parol evidence. Since the contract was unambiguous, parol evidence should not have been admitted. Furthermore, parol evidence was not used here to explain the terms of the contract but to vary the terms of the contract. There is no plausible way that the testimony of Scottye's attorney can be seen as an attempt to explain "balance." It would be absurd to assert that "balance" could mean "one half the balance." If that was her intent she should have included that wording in her offer. Scottye's attempts to construe "balance" to mean "one half the balance" are an attempt to vary the terms of the contract through the use of parol evidence. In any event, parol evidence should not have been admitted.

¶40.    The right to make and enforce a contract is fundamental in our society.

> It is fundamental that the right to make contracts pertaining to business is one of the rights guaranteed by the law of the land, and especially the fourteenth amendment to the Constitution of the United States. Unless the parties dealing with the subject-matter by their conduct modify or change the contract originally made, or so act in reference to it as to make it inconsistent for a party to claim or rely upon the contract contrary to its agreement and stipulations, it must be enforced as written.

*Jones v. Mississippi Farms. Co.*, 76 So. at 883. This Court has stated that " '[t]he right to contract is fundamental to our jurisprudence and absent mutual mistake, fraud and/or illegality, the courts do not have the authority to modify, add to, or subtract from the terms of the contract validly executed between

17

two parties.' " *Wallace v. United Mississippi Bank*, 726 So.2d 578, 584 (Miss. 1998) (quoting *First Nat'l Bank of Vicksburg v. Caruthers*, 443 So.2d 861, 864 (Miss. 1983)). " 'Contracts are solemn obligations and it is not the function of the courts to make contracts for parties, but rather to give effect to them as written.' " *Miller v. Mississippi Stone Co.,* 379 So.2d 919 (Miss. 1980) (quoting *Roberts v. Corum*, 236 Miss. 809, 815, 112 So.2d 550, 556 (Miss. 1959)).[2]

## II.  THE FACTS DO NOT SUPPORT A FINDING OF UNILATERAL MISTAKE ENTITLING SCOTTYE R. HOOKER TO RESCISSION.

¶41.  The majority erroneously holds that the chancellor correctly found that Scottye is entitled to rescission of the contract due to unilateral mistake. "Mississippi courts require that unilateral mistake, like mutual mistake, be proven beyond a reasonable doubt." *Crosby-Mississippi Resources, Ltd. v. Prosper Energy Corp.*, 974 F.2d 612, 616 (5th Cir. 1992) (citing *Terre Haute Cooperage v. Branscome*, 203 Miss. 493, 540, 35 So.2d 537, 540 (1948) (holding that a claim of unilateral mistake must be proven beyond a reasonable doubt)).  It is obvious from a review of the record, that there is insufficient evidence to prove "beyond a reasonable doubt" that a unilateral mistake was committed.

¶42.  This Court is not in the habit of granting rescission of a contract due to unilateral mistake.  " 'But where the mistake is of so fundamental a character, that the minds of the parties have never, in fact, met; or where an unconscionable advantage has been gained, by mere mistake or misapprehension; and there was no gross negligence on the part of the plaintiff, either in falling into the error, or in not sooner claiming redress; and no intervening rights have accrued; and the parties may still be placed in statu quo; equity will interfere, in its discretion, in order to prevent intolerable injustice.' " *Miss. State Bldg. Comm'n v.*

---

[2] This holding is consistent with this Court's recent decision regarding the admission of parol evidence in *In the Matter of the Estate of Fitzner v. Fitzner*, 2001-CA-01898-SCT.

***Becknell***, 329 So.2d 57, 60-61 (Miss. 1976) (quoting ***State Highway Comm'n v. State***

***Construction Co.***, 203 Or. 414, 435; 280 P.2d 370, 380 (Or. 1955)).  The test is more understandable

if laid out as factors.  In order to obtain rescission due to unilateral mistake, a party must show ***either***

    (1)       The mistake is so fundamental that the parties minds never met *plus*
                  (a)  there was no gross negligence on the part of the plaintiff, either in falling into the error, or in not sooner claiming redress, *and*
                  (b)  no intervening rights have accrued, *and*
                  (c) the parties may still be placed in the statu quo.

    (2)       That an unconscionable advantage has been gained, by mere mistake or misapprehension *plus*
                  (a)  there was no gross negligence on the part of the plaintiff, either in falling into the error, or in not sooner claiming redress, *and*
                  (b)  no intervening rights have accrued, *and*
                  (c) the parties may still be placed in the statu quo.

***Id.***

¶43.    Under the first test, Scottye is not entitled to rescission based on unilateral mistake.  As discussed

above, there was an offer and acceptance.  The mere fact that Scottye now retracts here the stated price

and wishes to change it, does not mean that there was no "meeting of the minds".  Likewise, even if Scottye

intended "balance" to mean one half of the balance of the Met Life debt, she should have included language

to that effect in her offer.  This amounts to inexcusable negligence.

¶44.    Under the second test, Scottye is not entitled to rescission based on unilateral mistake.  There was

no unconscionable advantage gained by the mistake or misapprehension.  The only conceivable argument

for unconscionable advantage is that Clint is getting land at below appraisal due to Scottye setting her selling

price below market value.  But this Court has held that inadequacy of consideration alone, will not entitle

19

a party to rescission on the basis of unconscionability. *Johnson v. Brewer*, 427 So.2d 118, 125 (Miss. 1983) (citing *Foster v. Pugh*, 20 Miss. 12 S & M 416, 422 (1849)).

¶45. In *Johnson*, the court found that inadequate consideration coupled with fraud entitled the plaintiffs to rescission of a mineral lease. 427 So.2d 118. The Court found that fraud or oppression, when coupled with inadequate consideration renders a contract unconscionable. *Id.* at 125. Furthermore, this Court has held that "there may be cases where relief may be proper if 'enforcement of the contract would be unconscionable,' yet only where the party making the mistake 'was in the exercise of reasonable diligence.' *Hunt v. Davis*, 208 Miss. 710, 45 So.2d 350, 352 (1950) (quoting *Butterfield Lumber Co. v. Guy*, 92 Miss. 361, 364, 46 So. 78, 80 (1908)). "A mere improvident contract supplies no basis." *Id.* Here we have an "improvident contract" with no fraud or oppression.

¶46. Furthermore, "'[t]he law will not weigh the quantum of consideration in a contract, and so long as it is something of real value in the eyes of the law it is sufficient.'" *Matter of Johnson's Will*, 351 So.2d 1339, 1341 (Miss. 1977) (quoting *Ogle v. Durley*, 223 Miss. 32, 43, 77 So.2d 688, 693 (1955)). Scottye set her purchase price with no appraisal and no help from a qualified real estate expert. She chose the amount of consideration. This Court should not allow her to retract her offer because she now feels the purchase price is inadequate. It is worth noting that her attorney testified that Scottye did not require an appraisal or expert advice before conveying her fishing and hunting interests. Additionally, he acknowledged that the hunting and fishing rights were worth more than the legal bills the trade was meant to compensate him for.

¶47. The majority relies on *Becknell*, for the proposition that a unilateral mistake occurred. It is argued that Scottye's mistake was an "honest mistake" as in *Becknell* deserving of rescission. In

20

***Becknell*** a construction company submitted an erroneous bid to the State Building Commission. 329 So.2d at 57. This Court found that the bid was for less than the cost necessary for construction and was due to an honest, yet negligent, mistake of the construction company. ***Id.*** at 61. An important deciding factor for this Court was that of public policy with respect to bids for state and/or government construction projects. ***Id.*** at 62. It would not be in the public's best interest to drive a construction company out of business by enforcing an erroneous bid for the construction of a government project. Here, we are dealing with two individuals engaged in a private and arms length transaction. There is no public interest to be protected as in ***Becknell***. The contracting parties should be free to reach whatever deal they see fit and have full assurance that their mutual obligations will be enforced.

¶48. Scottye made a bad deal but that fact alone does not make her deserving of rescission due to unilateral mistake. " '[T]his court has been liberal in reviewing transactions where one party might have the advantage over another party in experience, knowledge, and wisdom; but in the absence of fraud, deceit, or fiduciary relations of some kind, the court cannot relieve a person from the consequences of his acts merely because he has not acted prudently or diligently about his contracts or other matters.' " ***Johnson***, 427 So.2d at 125 (quoting ***Fornea v. Goodyear Yellow Pine Co.***, 181 Miss. 50, 65-66, 178 So. 914, 918 (1938)).

¶49. The majority has equity step forward and give Scottye the benefit of voiding her "bad deal." While equity is appropriate relief to prevent "inequitable and fundamentally unjust" outcomes, it does not follow that this Court or any court of this State should use equity as a "re-do" for those who decide after the fact that they are not satisfied with the contractual deal they have made.

> **III. UNDER APPLICABLE PRINCIPLES OF CONTRACT LAW, THE CONTRACT IS CLEAR AND DEFINITE, THEREFORE SUPPORTING A CLAIM FOR SPECIFIC PERFORMANCE.**

¶50. Lastly, the majority erroneously holds that the chancellor correctly found that the contract was incapable of specific performance.

¶51. "Specific performance has traditionally been regarded as a remedy for breach of contract that is not a matter of right but of sound judicial discretion." *Frierson*, 794 So.2d at 225 (citing *Osbourne v. Bullins*, 549 So.2d 1337, 1339 (Miss. 1989)). "[W]here a contracting party can feasibly be given what he bargained for, specific performance is the preferred remedy." (*Id.*). This Court has stated the familiar standard for specific performance as:

> Before a court of equity will enforce a specific contract for the sale of lands, the contract must be specific and distinct in its terms and must show with certainty that the minds of the parties have met and mutually agreed upon all the details. There must be an offer upon the one hand an unqualified acceptance of this offer upon the other; if any of these requisites be lacking, specific performance will not be declared.

*Fowler v. Nunnery*, 126 Miss. 510, 89 So. 156, 158 (1921) (quoting *Welsh v. Williams*, 85 Miss. 301, 302, 37 So. 561, 561 (1904)). "A contract is sufficiently definite if it contains matter which would enable the court under proper rules of construction to ascertain its terms, including consideration of the general circumstances of the parties and if necessary relevant extrinsic evidence." *Estate of Smith v. Samuels*, 822 So.2d 366, 369-70 (Miss. Ct. App. 2002). "The purchase price is an essential term that must be stated with specificity or the contract fails." *Leach*, 586 So.2d at 803); *Hunt*, 741 So.2d at 1014. "[A]n agreement should not be frustrated where it is possible to reach a reasonable and fair result." *Busching v. Griffin*, 542 So.2d 860, 862 (Miss. 1989) (citing *Jones v. McGahey*, 187 So.2d 579, 584 (Miss. 1966); *Estate of Smith*, 822 So.2d at 370.

22

¶52. Clint accepted Scottye's offer verbatim and under the specific provisions provided for in her offer. Even the chancellor recognized this. There was no counter-offer or mis-description. Here, we are not dealing with inconsistent instruments. The offer and the acceptance are identical. Even the chancellor found that there was a "meeting of the minds" with regard to the offer and acceptance.

¶53. On this subject, it is worth looking at *Estate of Smith* and *Busching*. *Estate of Smith* dealt with a landowner's estate who sought rescission of a land sale option contract after having second thoughts about the purchase price. 822 So.2d at 370. The court reasoned that allowing such rescission would be inequitable. *Id*. Likewise, *Busching* dealt with a landowner who repudiated a land contract after discovering that the price fell below market value. 542 So.2d at 860. This Court opined that if it let the landowner off the hook the "integrity and enforceability of written contracts would be greatly doubted." *Id.* at 866.

¶54. The land involved in this sale is very unique to Clint. It has been in his family for years. He intended to keep the land in his family. Scottye, on the other hand, has already disposed of some of the lands rights by selling the hunting and fishing rights to her attorneys. She has exhibited no sentimental family connection to the land. After all, she traded her hunting and fishing rights to pay her legal bills.

¶55. The majority places great weight on the fact that if this contract is enforced, Scottye will lose $230,000, because that is Clint's one half (½) of the debt which she would be paying. This is of no consequence. In *Taylor v. Firestone Tire & Rubber Co.*, 519 So.2d 436 (Miss. 1988), this Court enforced a settlement agreement whereby the plaintiff only received $2,000 for a personal injury claim, despite the fact that the plaintiff had incurred $6,500 in medical expenses. *Id.* at 437-38. Scottye made a bad deal or her attorney failed to clarify the offer. In either event, neither mistake entitles her to rescission. "[T]he mere fact that the defendant made a bad trade or bargain is not sufficient to defeat an

23

obligation of specific performance." *Clinton Serv. Co. v. Thornton*, 233 Miss. 1, 11, 100 So.2d 863, 867 (1958).

¶56. The Chancellor erred in granting rescission of the agreement between Clint and Scottye. The Chancellor's judgment should be remanded for entry of a judgment granting specific performance of the agreement.

¶57. For these reasons, I dissent.