ISHEE, J„
 

 for the Court.
 

 ¶ 1. On May 11, 2006, Ken Covington and Mitch Mosley filed a complaint in the Chancery Court of Kemper County to enforce an option contract against Cremonia Griffin for the sale of 161 acres of her land located in Kemper County, Mississippi. On September 19, 2006, the chancery court entered a default judgment against Griffin for failure to plead, answer, or otherwise defend the complaint. Griffin later filed motions to set aside the default judgment, for a stay of the judgment, and to extend the time for filing a notice of appeal. The chancery court granted the motion to set aside the default judgment on November 20, 2006, finding that Covington and Mosley failed to comply with the strict requirements of process by publication, which resulted in insufficient service of process. A trial on the merits was held, and on January 10, 2008, the chancery court entered a judgment in favor of Griffin and dismissed Covington and Mosley’s claim with prejudice. Aggrieved by the judgment, Coving-ton and Mosley filed the present appeal. They argue that the chancery court erred by setting aside the default judgment and by refusing to enforce the option contract.
 

 FACTS AND PROCEDURAL HISTORY
 

 ¶ 2. Covington and Mosley each owned property adjoining Griffin’s land in Kem-per County. Mosley was an automobile salesman in Dekalb, Mississippi, from whom Griffin had previously purchased two cars, and he owned the property to the east of Griffin. Covington owned a pig farm on the western side of Griffin’s property. Griffin was familiar with both Cov-ington and Mosley and had known their families as neighbors for many years. Covington and Mosley approached Griffin multiple times about selling the property, but each time she declined their offer. Covington testified at trial that sometime in February 2006, Benny Mayberry informed him that Benny was authorized to sell Griffin’s property. Benny, along with Precious Mayberry, was living, with per
 
 *808
 
 mission, in an old wooden home located on the Griffin property. Covington testified that he approached the Mayberrys, who told him they were authorized to negotiate on behalf of Griffin, and they offered to sell the property for $1,250 an acre.
 

 ¶ 3. The proposed sale with the Mayber-rys fell through when they did not appear to sign the contract. Covington testified he then went to visit Griffin to inquire about possibly buying the property. He said that Griffin told him that no one was authorized to negotiate on her behalf. Following a visit to the courthouse to look at the land records, Covington confirmed his belief that Griffin was the rightful owner of the property. Covington and his father then visited Griffin, informed her that the Mayberrys were trying to sell the property, and also informed her that she was the rightful owner. Covington testified that he was concerned about the May-berrys’ actions and was concerned that they were not trustworthy, which is the reason why he approached Griffin personally about the land. He also testified that he told Griffin that he was interested in the property if she ever decided to sell it.
 

 ¶ 4. During this time, Griffin was living in an apartment in Meridian, Mississippi. On February 28, 2006, Griffin called Mosley and requested that he drive her from her apartment to her cousin’s home, which was also in Meridian.
 
 [1]
 
 Griffin requested that Mosley drive them in her car and keep the car at his house until she returned from a trip to California. She would then get someone to drive it to the airport to get her. Mosley explained that his wife drove him to Griffin’s home and then followed them to the bank in Meridian. At some point during the car trip, both parties agreed to stop at a Trustmark Bank in Meridian. However, there is a dispute as to how and why the parties arrived at the bank, and as to the validity of the option contract that was signed once they reached the bank.
 

 ¶ 5. At trial, Mosley claimed that Griffin agreed to sell the land at some point during the car trip and that he took her to the bank that same day to sign and notarize an option contract that had been previously prepared and brought to the bank by Mosley’s wife. The option contract, which was introduced at trial, provided that Mosley would pay Griffin $1,000 in consideration for the option to purchase her land in Kemper County within 180 days from the date of the contract. The option contract also provided that Mosley would pay Griffin $1,000 dollars per acre for all of her land. Mosley gave her a check for $1,000 at the bank with “earnest money” written on it, but he said that she did not read the contract.
 

 ¶ 6. Griffin maintained that she never agreed to sell the land and was unaware that she was signing an option contract at the bank. She testified at trial that Mosley suggested that they go to the bank since she was about to go on a trip and might need some spending money. At the bank, she claimed that Mosley offered her $1,000 for spending money for her trip, and she believed that she was merely signing a single sheet of paper to show receipt of the check. Griffin maintained that she was totally unaware of the fact that she had signed an option contract to sell her property and claimed that Mosley never even asked about buying her property on the day he drove her to the bank. Griffin testified that she never read the three-page option contract, and Mosley admitted that, after Griffin signed it, he never gave
 
 *809
 
 her a copy of it. Griffin attempted to return the check the next day, but Mosley refused to accept it. Griffin never cashed the check, and she later instructed her brother to send it back to Mosley. Mosley and Covington recorded the option contract on the date it was signed and later brought suit to enforce it.
 

 ¶ 7. Griffin testified that in late August or early September 2006, she returned from California and traveled back to Mississippi. On that trip back, she signed over the deed to the property to her brother, Robert, who lived in Missouri. Griffin said that Robert promised to take care of the court action regarding Mosley and Covington.
 

 ¶ 8. On May 11, 2006, Mosley and Cov-ington filed a complaint to enforce an option contract against Griffin for the sale of 161 acres of her land located in Kemper County. The complaint described Griffin as a resident of Kemper County, Mississippi, but it listed her last known addresses as being in El Cajon, California and San Bernardino, California. Mosley and Cov-ington attempted service of process by publication in the
 
 Kemper County Messenger
 
 on May 18, 2006, May 25, 2006, and June 1, 2006. However, the chancery clerk did not mail a copy of the summons and complaint to Griffin’s last-known addresses until July 17, 2006. On July 6, 2006, Mosley and Covington filed an application for entry of default, and the clerk entered a clerk’s default against her that same day. On September 19, 2006, a default judgment was entered against Griffin for failure to plead, answer, or otherwise defend the complaint. Mosley and Coving-ton mailed copies of the default judgment to Griffin at addresses in El Cajon, California; San Bernardino, California; and St. Louis, Missouri.
 

 ¶ 9. On October 18, 2006, Griffin filed motions to set aside the default judgment, for a stay of the judgment, and to extend the time for a filing notice of appeal. The chancery court granted the motion to set aside the default judgment, finding that the Mosley and Covington failed to comply with the strict requirements of process by publication, which resulted in insufficient service of process on Griffin. A trial on the merits was held, and on January 10, 2008, the chancery court entered a judgment in favor of Griffin.
 

 ¶ 10. In the chancellor’s judgment, he made the following findings: (1) a unilateral mistake and misapprehension on the part of Griffin existed regarding the formation of the contract, and due to Griffin’s questionable mental state, there was no true meeting of the minds; (2) a fiduciary relationship existed between the parties; (3) Griffin was of unsound mind; and (4) it would be procedurally unconscionable to enforce the option contract, and the dictates of equity required that the contract be set aside. The chancellor based the finding of a fiduciary relationship, in part, on the fact that Griffin was a sixty-seven-year-old woman with mental health problems, who recently had been a patient at Alliance Mental Health Center, and was on medication for her mental condition at the time the option contract was signed. The chancellor noted that Griffin’s testimony was that she had known Mosley for thirty or forty years, but Mosley claimed to have known her since the mid 1990s. Also, testimony revealed that Covington had known Griffin’s family since he was a teenager. The chancellor noted that Griffin’s relationship with Mosley was such that she was comfortable asking him to drive her to her cousin’s home in Meridian.
 

 ¶ 11. The chancellor determined that the contract met all of the requirements to be a valid option contract and that the price was “not so low as to shock the conscience.” The chancellor also found
 
 *810
 
 that the evidence did not support a finding of fraud in the signing of the contract. Nevertheless, the chancellor concluded Griffin had made a mistake or misapprehension about what she was doing by signing the option contract; therefore, he found support for the claim of procedural unconscionability. Further, the chancellor determined that due to Griffin’s mental state, there was never a true meeting of the minds and that she did not understand the implications of signing the contract. The chancellor took into consideration the fact that Griffin did not cash the check, attempted to return it after relatives pointed out the check contained an “earnest money” notation, and stated on many previous occasions that she did not want to sell her property. The chancellor recognized that once Griffin understood the definition of “earnest money” she attempted to return the check, which indicated a lack of voluntariness on her part in executing the contract. The chancellor further noted that even under Mosley’s and Covington’s versions of events, Griffin was taken to sign the option contract immediately after she agreed to sell the land. This denied her an opportunity to consult with family or an attorney in order to protect her interest and denied her any time to study the contract. The chancellor pointed out that the most troubling aspect of the transaction was the huge disparity in sophistication of the parties-two savvy businessmen and an elderly woman with a history of mental problems. It is from this judgment that Covington and Mosley now appeal.
 

 STANDARD OF REVIEW
 

 ¶ 12. “Findings of fact made by a chancellor will not be disturbed unless the lower court abused its discretion, was clearly erroneous, or applied an erroneous legal standard.”
 
 Bert Allen Toyota, Inc. v. Grasz,
 
 909 So.2d 763, 767(¶ 10) (Miss.Ct.App.2005) (citing
 
 Bowers Window and Door Co. v. Dearman,
 
 549 So.2d 1309, 1312-13 (Miss.1989)). An appellate court will not reverse the findings of the chancellor if there “is substantial evidence supporting those findings.”
 
 Id.
 
 However, we will review questions of law under a de novo standard.
 
 ERA Franchise Sys., Inc. v. Mathis,
 
 931 So.2d 1278, 1280(¶ 7) (Miss.2006).
 

 DISCUSSION
 

 I. Setting Aside the Default Judgment
 

 ¶ 13. Mosley and Covington argue on appeal that the chancellor erred in setting aside the default judgment. They point out that the complaint, filed May 11, 2006, listed Griffin’s last known addresses in California and that service of process by publication was proper. However, they acknowledge that the chancery clerk failed to promptly send by first class mail, postage prepaid, a copy of the summons and complaint to the addresses listed in the complaint until July 17, 2006. Mosley and Covington contend that the chancellor erred in finding that the summons and complaint should have been mailed simultaneously with the issuance of the summons by publication. They take issue with the finding that the delay from May 18, 2006, until July 17, 2006, after entry of the clerk’s default, did not comply with Mississippi Rule of Civil Procedure 4(c)(4). They argue that the chancery clerk’s delay in mailing a copy of the summons and complaint to Griffin did not prejudice her or put her at a disadvantage because Griffin’s testimony revealed that she was aware of the court proceedings in early September, before the default judgment was entered. Furthermore, she deeded the property at issue to her brother in September 2006, and the deed was record
 
 *811
 
 ed in the chancery clerk’s office on September 19, 2006, the same day the default judgment against her was filed. They argue the purpose of service of process is to inform a party of the pending court action, and in this case, Griffin was aware of the action and had an ample opportunity to answer.
 

 ¶ 14. Griffin responds that: (1) default judgments are not favored by law in Mississippi, and fairness and equity in this case dictate that the default judgment was correctly set aside; (2) Mosley and Cov-ington’s complaint did not strictly comply with the provisions of Mississippi Rules of Civil Procedure 4(c)(4)(A), thereby making the default judgment void; and (3) defective service of process voided the default judgment against Griffin since the chancery court did not have personal jurisdiction over her. She argues that she could have been served by certified mail, restricted delivery under Rule 4(c)(5) of the Mississippi Rules of Civil Procedure. Griffin also notes that they mailed a copy of the final default judgment to an address in St. Louis, Missouri, which was not included in the complaint. Griffin argues that since she was never properly served with process, the chancery court did not have personal jurisdiction over her, and the chancery court properly found the default judgment to be void.
 

 ¶ 15. Generally, this Court reviews a trial court’s decision on whether to set aside a default judgment under an abuse of discretion standard.
 
 Stanford v. Parker,
 
 822 So.2d 886, 887-88(¶ 6) (Miss.2002) (citing
 
 McCain v. Dauzat,
 
 791 So.2d 839, 842(¶ 5) (Miss.2001)). However, improper service of process coupled with that defendant’s failure to voluntarily appear prevents the trial court from entering a judgment against him.
 
 Sanghi v. Sanghi,
 
 759 So.2d 1250, 1257(¶ 33) (Miss.Ct.App.2000). “A court must have jurisdiction, proper service of process, in order to enter a default judgment against a party. Otherwise, the default judgment is void.”
 
 McCain,
 
 791 So.2d at 842(¶ 7) (internal citation omitted). “If a default judgment is void, the trial court has no discretion and must set the judgment aside.”
 
 Id.
 
 (citing
 
 Sartain v. White,
 
 588 So.2d 204, 211 (Miss.1991)). It is not sufficient to obtain jurisdiction that a defendant merely finds out about a lawsuit filed against her.
 
 Sanghi,
 
 759 So.2d at 1257(¶ 33) (citing
 
 Mansour v. Charmax Indus., Inc.,
 
 680 So.2d 852, 854-55 (Miss.1996)).
 

 ¶ 16. In
 
 Kolikas v. Kolikas,
 
 821 So.2d 874, 879(¶ 32) (Miss.Ct.App.2002), this Court held that under Rule 4(c)(4), “[p]roper service upon a non-resident defendant requires that notice be published and, a copy of the summons and complaint mailed to the defendant’s last known address .... Process is not complete until a copy has been mailed.”
 
 Id.
 
 (citing
 
 Williams v. Kilgore,
 
 618 So.2d 51, 56 (Miss.1992)).
 

 ¶ 17. We find no error with the chancellor’s ruling that Griffin was not properly served with process when the complaint was not mailed to her last known addresses until after the chancery clerk had entered a default. While the clerk eventually did mail a copy of the summons and complaint, the chancellor found that they were not mailed until after the entry of default. It was not sufficient, as Mosley and Covington argue, that Griffin found out about the proceeding approximately two weeks before the chancery court entered its default judgment against Griffin. Improper service of process, coupled with Griffin’s failure to appear rendered the default judgment against her void. Accordingly, we find that this issue is without merit.
 

 
 *812
 
 II. Enforcement of the Option Contract
 

 A. Misapprehension or Unilateral Mistake
 

 ¶ 18. Covington and Mosley contend that Mosley was under no duty to explain the terms of the option contract to Griffin. Nevertheless, they claim that Mosley did explain the terms of the contract by informing her that it was an option contract to purchase the property for $1,000 per acre, with earnest money of $1,000 being paid. They point out that the check had “earnest money” written on it when Mosley gave it to Griffin. Further, they contend that there was no trial testimony demonstrating that Griffin relied upon any misrepresentation in signing the option contract. They argue that Griffin received more than adequate consideration for the property, and that she made no unilateral mistake in signing the option contract. What actually happened, they claim, was that she simply changed her mind after she received negative feedback about the transaction from her family. They also take issue with the chancellor’s findings as to Griffin’s mental condition. They argue that she was capable of managing her own affairs and was not suffering from any condition which would have prevented her from understanding the consequences of her actions by signing the contract. Mosley and Covington conclude that the chancellor’s findings were not supported by the evidence and should be reversed.
 

 ¶ 19. In contrast, Griffin argues that the chancery court was correct in refusing to enforce the option contract against her. Griffin argues that the chancellor was correct in finding that there was no “meeting of the minds,” as Griffin had made a mistake or misapprehension about what she was doing when she signed the contract. Griffin points out that on several prior occasions, she had made it clear that she had no interest in selling her property, and she never took any preliminary steps toward selling the property. Griffin testified at trial that she did not know why Mosley gave her the $1,000 check and was assured that it was a gift. She also claimed that she did not know that she signed an option contract. After reading the contract at trial, Griffin was confused in that she thought that the entire contract price was $1,000 and that she was unaware how much of her land the contract purported to sell. Also, Griffin never cashed the earnest money check and attempted to return the check shortly after receiving it.
 

 ¶20. Ultimately, the chancellor determined that: (1) a mistake and misapprehension on the part of Griffin existed regarding the formation of the contract, and due to Griffin’s questionable mental state, there was no true meeting of the minds; (2) a fiduciary relationship existed between the parties; (3) Griffin was of unsound mind; and (4) it would be proeedurally unconscionable to enforce the option contract, and the dictates of equity require that the contract be set aside. This Court will address each of the findings upon which the chancellor based his decision to rescind the contract. However, we note at the outset that we find sufficient evidence in the record to support the chancellor’s ruling that: Griffin made a unilateral mistake regarding the fundamental character of the contract; she was unaware she was signing a contract; and it would be unconscionable to enforce that contract. Accordingly, we find that the chancellor did not err in refusing to enforce the contract, and we uphold the chancellor’s judgment rescinding the option contract.
 

 ¶ 21. Mosley and Covington cite
 
 Brown v. Chapman,
 
 809 So.2d 772 (Miss.Ct.App.2002) in support of their argument that Griffin did not make a unilateral mistake that requires the option contract to be
 
 *813
 
 rescinded. In
 
 Brovm,
 
 the grandmother, Veola Brown, sought to have a deed that she voluntarily executed reformed in order to greatly reduce the amount of land that she conveyed to her grandson.
 
 Id.
 
 at 773(¶ 1). Both parties to the contract agreed that the contract was executed in order to convey land to Jeffrey Chapman in order for him to build a home.
 
 Id.
 
 at (¶ 2). However, Brown later sought reformation of the contract, arguing that she intended to convey only about one or two acres to her grandson, not the entire seventeen acres specified in the deed.
 
 Id.
 
 Brown admitted that she did not read the instrument because she believed that Chapman had only conveyed the one or two acres to which they had previously agreed.
 
 Id.
 
 at 774(¶ 6). This Court determined that, absent an allegation of fraud, the only way Brown would be entitled to reform the contract was if she proved that the conveyance did not accurately reflect the intentions of both parties.
 
 Id.
 
 at (¶ 8). We noted that reformation may be permissible in instances of mutual mistake or when “the error has arisen by the unilateral mistake of one party and that mistake is accompanied by evidence of some sort of fraud, deception, or other bad faith activity by the other party that prevented or hindered the mistaken party in the timely discovery of the mistake.”
 
 Id.
 
 at (¶ 9) (citing
 
 McCoy v. McCoy,
 
 611 So.2d 957, 961 (Miss.1992)). The facts in
 
 Brown
 
 revealed that despite her advanced age, Brown maintained an independent lifestyle and that she was perfectly capable of making her own independent decision.
 
 Id.
 
 at 775(¶ 14). We also noted that Brown was encouraged, in the presence of a neutral third party, to read the entire document to ensure it comported with her intention.
 
 Id.
 
 at (¶ 15). Nevertheless, Brown freely admitted she did not read the conveyance, even though she had ample opportunity to do so.
 
 Id.
 
 at (¶ 12). Brown also admitted that she intended to convey at least a portion of her land to her grandson and that she merely wanted to reform the conveyance.
 
 Id.
 
 at 773(¶ 2). In ruling in favor of Chapman, this Court stated that “the chancellor hears the evidence firsthand and is in the best position to assess the credibility of the witnesses.”
 
 Id.
 
 at 776(¶ 16). Furthermore, “a substantial measure of credible evidence” supported the chancellor’s finding that Chapman “told a more credible version of the events that led to the execution of the instrument in question[.]”
 
 Id.
 

 ¶ 22.
 
 Brown
 
 is distinguishable from the present case in several ways. In this case, the chancellor found Griffin’s version of events to be more credible. According to Griffin, she never discussed selling the land to Mosley on the day he drove her to the bank, and she thought that she was merely signing a receipt for a check for spending money that Mosley gave her for her upcoming trip. Also, the two sides do not agree that there was even an intent to sell Griffin’s property, and Griffin asked for the contract to be rescinded, not modified. Furthermore, unlike Brown, Griffin had been treated for mental illness throughout her life, and she had many persons assisting her with her daily transactions. The chancellor also found that Mosley and Covington were vastly more sophisticated than Griffin and that she did not have time to review the contract.
 

 ¶ 23. “The remedy for [a] unilateral mistake is rescission.”
 
 Grasz,
 
 909 So.2d at 769(¶ 18). The supreme court has stated the following regarding a unilateral mistake: “[EJquity will prevent an intolerable injustice such as where a party has gained an unconscionable advantage by mistake and the mistaken party is not grossly negligent.”
 
 Rotenberry v. Hooker,
 
 864 So.2d 266, 271(¶17) (Miss.2003). In order to rescind a contract on the basis of
 
 *814
 
 a unilateral mistake, it must be shown that: (1) “the mistake is of so fundamental a character that, the minds of the parties have never, in fact, met; or where an unconscionable advantage has been gained, by mere mistake or misapprehension”; (2) “there was no gross negligence on the part of the plaintiff, either in falling into the error, or in not sooner claiming redress”; (3) “no intervening rights have accrued”; and (4) “the parties may still be placed in status quo[.]”
 
 Id.
 
 (citing
 
 Miss. State Bldg. Comm’n v. Becknell Const., Inc.,
 
 329 So.2d 57, 60-61 (Miss.1976));
 
 see also Ruff v. Estate of Ruff,
 
 989 So.2d 366, 370(¶ 14) (Miss.2008) (applying the four-part test from Rotenberry).
 

 ¶ 24. This Court finds no error in the chancellor’s determination that Griffin was mistaken and that there had been no true meeting of the minds. While the chancellor did not find that the acts of Covington and Mosley amounted to fraud, according to Griffin’s testimony, their actions in getting the contract signed were questionable. They gained an unconscionable advantage by having an elderly lady with mental problems sign a contract that she did not know was a contract, which she did not review, and it was all settled almost on the spur of the moment, despite the fact that Griffin had repeatedly refused to sell the land. The error by Griffin was fundamental because she never even realized she was signing a contract; thus, there was no meeting of the minds. Further, the chancellor determined that Griffin was not grossly negligent, and this finding is supported by the evidence. Cov-ington and Mosley have failed to show that any intervening rights have accrued because of the contract, and Griffin attempted to return the check the next day. Finally, it can be said that with regard to rescinding the contract, the parties may still be placed in status quo. Griffin never cashed the check, and no parties have detrimentally changed their position in reliance on the sale of Griffin’s land. Accordingly, we do not find that the chancellor erred in determining that Griffin signed the contract as a result of a unilateral mistake.
 

 B. Fiduciary Relationship
 

 ¶ 25. Mosley and Covington argue that the evidence presented at trial did not support the chancellor’s finding that a fiduciary relationship existed between Griffin and themselves. They claim that the only evidence supporting such a finding was that: they owned land adjacent to Griffin’s; they had known her for some time; and Mosley had previously sold cars to her. Therefore, they conclude that the chancellor’s determination that a fiduciary relationship existed between Griffin and them was erroneous.
 

 ¶ 26. Griffin argues that she had known both Mosley and Covington for many years prior to the transaction in question, and she placed trust in both men. She points to Covington’s testimony that he had lived on the land adjoining Griffin’s property since he was in third grade, had lived next to her for twenty years, had grown up hunting on Griffin’s land, and had known both Griffin and her parents. With the assistance of others, she previously had bought two cars from Mosley. She notes that Covington and Mosley attempted to act on her behalf to protect her from the Mayberrys. Despite the presence of her family and a caseworker in the area, she asked Mosley to drive her to the airport and keep her car overnight. She claims that all of these factors, when combined with her weakened mental condition, gave rise to a fiduciary relationship.
 

 ¶ 27. The supreme court has stated that “a fiduciary duty may exist when there is a relationship wherein one person
 
 *815
 
 is in a position to exercise a dominant influence upon another, arising either from weakness of mind or body, or through trust.”
 
 Roman Catholic Diocese of Jackson v. Morrison,
 
 905 So.2d 1213, 1239(¶ 81) (Miss.2005) (citing
 
 Mullins v. Ratcliff,
 
 515 So.2d 1183, 1191 (Miss.1987)). The supreme court went on to state that “[a] confidential relationship such as would impose the duties of a fiduciary does not have to be a legal one, but may be moral, domestic or personal.”
 
 Id.
 
 (quoting
 
 Mullins,
 
 515 So.2d at 1191). “[A] confidential relationship is not confined to any specific association of persons but arises any time there appears on the one side an overmastering influence or, on the other, weakness, dependence, or trust, justifiably reposed.”
 
 Norris v. Norris,
 
 498 So.2d 809, 812 (Miss.1986) (citing
 
 Murray v. Laird,
 
 446 So.2d 575, 578 (Miss.1984)).
 

 ¶ 28. While this Court ultimately agrees with the chancellor’s decision to rescind the contract in this case, we cannot agree that a fiduciary relationship existed between the parties. From our review of the record, insufficient evidence exists to demonstrate to this Court that a true fiduciary relationship existed between Griffin and Covington and Mosley. However, as this Court agrees with the ultimate outcome in this case on alternate grounds, we find this issue does not constitute reversible error.
 

 C. Griffin’s Mental Capacity
 

 ¶ 29. Mosley and Covington argue on appeal that Griffin was capable of managing her own affairs and was not suffering from any condition which would have prevented her from understanding the consequences of her actions in signing the contract. Griffin points out that she had a history of mental illness and required assistance from others to handle her affairs. Griffin contends that she is mentally incompetent and unable to formulate a contract and that, under Mississippi law, she lacked the requisite mental capacity to execute a deed.
 

 ¶ 30. In support of her argument, Griffin cites
 
 McMahan v. Webb,
 
 990 So.2d 825, 827(9) (Miss.Ct.App.2008). Under
 
 McMa-han,
 
 Griffin claims that there was ample proof in the record that she, the grantor, suffered from a general weakness of the mind and that a confidential relationship existed between the grantor and the grantee. She argues that she suffered from a weak mind throughout her life, especially during the time period when this contract was signed. In support of her argument that she suffered from a general weakness of mind, Griffin points out that: (1) she received Social Security benefits at the time of trial due to her mental illness; (2) she previously had been confined in a mental facility in California, where she received mental treatment; (3) she was receiving mental treatment and taking medication at the time she signed the option contract; and (4) she received assistance in handling her affairs from her mother, her caseworkers, and others. Griffin argues that the determination of unsound mind is a question of fact and that the chancellor’s finding was correct and should be affirmed.
 

 ¶ 31. There are three ways to show a person is mentally incapable of executing a deed. These include:
 

 (1) establishing that the grantor suffered from a total lack of capacity to execute the deed (i.e., that the grantor did not understand the legal consequences of his or her actions); (2) establishing that the grantor suffered from a general “weakness of intellect” coupled with either (a) inadequate consideration given for the transfer or (b) a confidential relationship between the grantor and grantee; or (3) establishing that the
 
 *816
 
 grantor suffered from permanent insanity up to and after the date of execution.
 

 McMahan,
 
 990 So.2d at 827(¶ 9) (quoting
 
 Smith v. Smith,
 
 574 So.2d 644, 653-54 (Miss.1990)).
 

 ¶ 32. There was no evidence that Griffin suffered from a total lack of capacity or from permanent insanity. Griffin certainly suffered from a weakness of intellect, and the chancellor found a confidential relationship. However, the chancellor did not apply this test in making the final judgment. The chancellor did not find that Griffin’s mental condition, taken alone, warranted recision of the contract. Instead, the chancellor determined that Griffin was of unsound mind, and this was merely a factor he considered and not the ultimate reason for refusing to enforce the contract. According to the language of the judgment, the chancellor considered Griffin’s mental condition to be a significant factor, but the finding that Griffin was of unsound mind was supported by the evidence in the record.
 

 D. Procedural Unconscionability
 

 ¶ 33. Mosley and Covington point out that Griffin did not include in her answer and defenses a claim of procedural uncon-scionability, which is an affirmative defense and should have been raised in her answer. As a result, they allege that the chancery court erred in relying on uncon-scionability to set aside the option contract.
 

 ¶ 34. Griffin argues that the chancery court was correct in holding that the enforcement of the option contract would be proeedurally unconscionable. Griffin argues procedural unconscionability was demonstrated by a lack of voluntariness, disparity in the sophistication of the parties, and the lack of an opportunity to study the contract. Griffin argues she had no opportunity to negotiate the contract terms or to read, study, or consider the contract under advice of counsel or family members before signing it. Just before Griffin left on her trip to California, she was immediately taken to the bank after Mosley and Covington claim she changed her mind about selling the property. Griffin claims that Mosley’s testimony established that she only had five to ten minutes to review the contract before signing it and that Mosley never explained what she was signing. Further, Griffin argues she misunderstood what she was signing and was unaware that it was an option contract. She also never received a copy of the contract or cashed the check she was given. Griffin argues that there was a great disparity in sophistication between the parties to the option contract. Griffin points out Mosley owned a car dealership, was very familiar with sales contracts, and had personally bought and sold property on at least ten different occasions. Griffin also notes that Covington attended two years of junior college, had experience in negotiating contracts as part of his business dealings, had purchased property in the past, and had an attorney’s advice on those occasions. In contrast, Griffin claims that- she had never sold property before, had worked in factory jobs, and required assistance to perform such tasks as purchasing airline tickets and signing rental agreements.
 

 ¶ 35. As previously discussed, the issue of unconscionability is a consideration in deciding whether a party made a unilateral mistake in entering a contract.
 
 Rotenberry,
 
 864 So.2d at 271(¶ 17). Therefore, Covington and Mosley were made aware of the fact that it would be at issue when Griffin claimed there was no meeting of the minds. Evidence concerning the unconscionability of the contract was presented throughout the trial. Accordingly, we find no error with the chan
 
 *817
 
 cellor’s considering the uneonscionability of the contract even though Griffin did not raise it in her answer.
 

 ¶ 36. There are five factors a court will consider when determining whether a contract is procedurally unconscionable: “1) lack of knowledge; 2) lack of voluntariness; 3) inconspicuous print; 4) complex legalistic language; 5) disparity in sophistication or bargaining power; [and] 6) lack of opportunity to study the contract and inquire about the contract terms.”
 
 MS Credit Ctr., Inc. v. Horton,
 
 926 So.2d 167, 177(¶ 30) (Miss.2006). This Court agrees with the chancellor’s determination that to enforce the option contract would be procedurally unconscionable. The chancellor found that: Griffin was unaware she was signing a contract, which demonstrated both a lack of knowledge and lack of voluntariness; Griffin attempted to return the check as soon as she learned that it was for “earnest money”; there was a great and troubling disparity in sophistication between the parties; and when Griffin was immediately taken to the bank to sign the contract, she was denied an opportunity to study the contract and gain advice from outside counsel before signing it. Therefore, we find that the chancellor properly considered this issue, and we find no error with the determination that the contract was procedurally unconscionable.
 

 ¶ 37. Based on the foregoing, we find no error with the chancellor’s determination that the contract at issue was unconscionable and the result of a unilateral mistake. This issue is without merit.
 

 ¶ 38. THE JUDGMENT OF THE CHANCERY COURT OF KEMPER COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
 

 KING, C.J., LEE AND MYERS, P.JJ., IRVING, BARNES, CARLTON AND MAXWELL, JJ., CONCUR. GRIFFIS AND ROBERTS, JJ., NOT PARTICIPATING.
 

 [1]
 

 . Testimony at trial revealed that Griffin was not supposed to drive in her distressed condition at the time. At the time she called Mosley to pick her up and drive her to her cousin's home, she was on medication and had recently been in a mental health center.