# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2014-CA-00819-COA

| | |
|---|---|
| IN THE MATTER OF THE LAST WILL AND TESTAMENT AND ESTATE OF FRANCES B. HOLMES, DECEASED: JAMES BRETT HOLMES | APPELLANT |

v.

| | |
|---|---|
| BECKY TURNER | APPELLEE |

| | |
|---|---|
| DATE OF JUDGMENT: | 05/20/2014 |
| TRIAL JUDGE: | HON. J. DEWAYNE THOMAS |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | LEONARD D. VAN SLYKE JR. |
| | TAYLOR BRANTLEY MCNEEL |
| ATTORNEY FOR APPELLEE: | JOHN DENVER FIKE |
| NATURE OF THE CASE: | CIVIL - WILLS, TRUSTS, AND ESTATES |
| TRIAL COURT DISPOSITION: | DISALLOWED APPELLANT'S CLAIM AGAINST ESTATE |
| DISPOSITION: | AFFIRMED - 09/01/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE GRIFFIS, P.J., ISHEE AND MAXWELL, JJ.

### MAXWELL, J., FOR THE COURT:

¶1.    "Generally, when necessaries are furnished to a person who by reason of mental incapacity cannot himself make a contract, the law implies or imposes an obligation or agreement on his part to pay for them[.]"[1]  In this case, while Frances Turner was a total-care Alzheimer's patient, her son Jimmy Turner wrote a series of checks to her to cover the cost

---

[1] *Talbert v. Ellzey*, 203 Miss. 612, 620, 35 So. 2d 628, 631-32 (1948).

of her nursing care. Thus, the law recognized an implied contractual obligation that Frances would repay Jimmy.

¶2. This obligation to reimburse Jimmy arose when the implied contract ended in November 2009. This is when Jimmy stopped paying for Frances's care and when Jimmy's sister set up a conservatorship for Frances that contained all of Frances's assets. But Jimmy never asserted a claim against the conservatorship. Neither did Jimmy's son, Brett Holmes Turner, who became the representative of Jimmy's estate after Jimmy died in March 2011.

¶3. Instead, Brett waited two more years, until March 2013, to file a claim against Frances's estate, which had been opened after Frances died in September 2011. Because Brett did not file Jimmy's claim within the three-year statute of limitations,[2] we affirm the chancellor's order, which disallowed Jimmy's claim for being untimely.

**Background Facts and Procedural History**

### I. Power of Attorney

¶4. For the last decade of her life, Frances was a total-care patient in a nursing home. She had three adult children: Jimmy, Becky, and Paul. From the time she entered the nursing home in May 2002 until the end of 2009, her son Jimmy had power of attorney and was responsible for paying her bills on her behalf.

¶5. Starting in September 2007, Jimmy began writing a series of personal checks to his

---

[2] Mississippi Code Annotated section 15-1-29 (Rev. 2012) imposes a three-year statute of limitations for unwritten implied contracts.

2

mother—totaling almost $85,000—purportedly to pay for her nursing care. While his mother had assets to pay for her care (more than $150,000), these assets were tied up in stock investments. Apparently, Jimmy did not want to sell the stock while his mother was still alive for tax reasons. So he advanced her cash.

## II.    Conservatorship

¶6.    Jimmy wrote the last check to his mother on November 20, 2009. A month later, his sister, Becky, discovered her mother owed $11,000 to the nursing home in past-due bills. Becky immediately filed for a conservatorship. She was appointed Frances's conservator in January 2010. Though Jimmy had been notified of the hearing involving his mother's conservatorship, he never appeared in that matter.

¶7.    Becky's first action as conservator was to liquidate her mother's stocks and begin using the proceeds to pay for Frances's nursing care. Becky planned to use all the cash from the stock sale to pay for Frances's care and, when that money ran out, enroll Frances in Medicaid. According to Becky, Jimmy got mad that she sold the stock. He left Becky a string of angry voicemails, insisting the money from the stocks belonged to him. Becky responded with a letter, written in February 2010. In this letter, she explained the stock proceeds had been placed in the conservatorship and had to be used to pay for Frances's care. Beyond these phone calls, there is no evidence Jimmy sought repayment from the conservatorship for the money he had advanced his mother for her care.

## III.    Estate

3

¶8. A year later, in March 2011, Jimmy died. Frances died six months later, in September 2011. Upon Frances's death, Becky filed to end the conservatorship and open her mother's estate. Becky notified Jimmy's son, Brett, that his grandmother's will had been probated. Under the terms of Frances's will, because Jimmy predeceased Frances, Brett was to inherit his father's share of the estate.

¶9. Starting November 17, 2011, Becky published a series of notices in the newspaper. These notices alerted potential creditors that they had ninety days from December 1, 2011, to probate their claims with the estate. Becky did not mail any individual notices, since she was unaware of anyone with a claim against Frances's estate.

¶10. In March 2013, more than a year after the ninety-day period expired, Brett, in his capacity as representative of Jimmy's estate, filed a claim against Frances's estate. Brett attached the cancelled checks from Jimmy to Frances. And he insisted his father's estate should be repaid the approximately $85,000 Jimmy had advanced to his mother to pay for her care.

¶11. Becky moved to close Frances's estate. In her motion, she asserted Frances's estate did not owe Jimmy's estate anything. Becky argued there could have been no binding agreement that her mother would repay Jimmy the money he advanced her because Frances had been an Alzheimer's patient, incapable of entering a contract. Further, Becky asserted Brett probated his claim too late.

¶12. In response, Brett argued Frances did not have to be capable of entering a contract to

4

bind her estate. Because Jimmy had power of attorney, he could act on her behalf—including advancing his money to her with the expectation of being repaid. But even if there was no contract, Brett argued equitable doctrines, like unjust enrichment, favored Jimmy's estate being repaid.

¶13. Brett also suggested he had timely asserted his father's estate's right to repayment. According to Brett, the ninety-day notice period to probate claims did not apply because Jimmy's estate was a "reasonably ascertainable creditor," entitled to personal mailed notice, which Becky never gave. *See* Miss. Code Ann. § 91-7-145(2) (Rev. 2013); *In re Estate of Ladner*, 911 So. 2d 673, 675-76 (¶¶13-14) (Miss. Ct. App. 2005) (strictly interpreting section 91-7-145(2) to require mailed notice be given to a "reasonably ascertainable creditor" before ninety-day statutory period begins to run). Brett also argued his March 2013 claim fell within the three-year statute-of-limitations period, which in his view did not begin to run until Frances died in September 2011.

¶14. After a hearing, the chancellor disallowed the claim. Becky had stipulated the proceeds from the checks Jimmy wrote to Frances between 2007 and 2009 were used for Frances's benefit. But the chancellor found "Brett ha[d] been unable to provide sufficient proof . . . to justify" the assertion the checks represented loans. The chancellor relied on the February 2010 letter Becky wrote to Jimmy as evidence that Becky considered the checks Jimmy wrote as gifts, not loans to be repaid at her death.

¶15. Additionally, the chancellor found the claim was time-barred. According to the

5

chancellor, Jimmy's estate was not a "reasonably ascertainable creditor" entitled to personal mailed notice. Thus, the published notice to creditors had been sufficient to start the ninety-day clock against Jimmy's estate. This meant Brett probated Jimmy's estate's claim fourteen months too late.

¶16. Within thirty days of entry of the chancellor's order disallowing the claim, Brett filed a notice of appeal.[3] On appeal, we leave the chancellor's factual findings undisturbed unless they are manifestly wrong or clearly erroneous. *McNeil v. Hester*, 753 So. 2d 1057, 1063 (¶21) (Miss. 2000). But we review questions of law de novo. *Id.*

**Discussion**

¶17. This appeal raises two questions: Did Brett assert a valid right to repayment? And if so, was his assertion timely? Our de novo review leads us to answer the first question differently than the chancellor. Under these circumstances, we find an implied contract arose that Jimmy would be paid for the money he expended on his mother's behalf. But like the chancellor, we find Brett waited too long to enforce Jimmy's right to repayment.

> ### I. Right to Repayment

---

[3] Becky asserts this order was not final and appealable, comparing it to the interlocutory order in the lawsuit-within-an-estate case *In re Estate of Drake*, 134 So. 3d 328 (Miss. Ct. App. 2013). But in contrast to the order in that case, the chancellor's order here finally resolved the probate claim by Jimmy's estate that Brett lodged against Frances's estate. Further, both the Mississippi Supreme Court and this court have exercised appellate jurisdiction over timely appeals from orders either allowing or disallowing claims against still-open estates. *E.g.*, *In re Estate of Petrick*, 635 So. 2d 1389 (Miss. 1994); *In re Estate of Ladner*, 911 So. 2d 673 (Miss. Ct. App. 2005).

¶18. Becky argued—and the chancellor agreed—that Frances, who suffered from Alzheimer's, was mentally incapable to enter a contract to repay the almost $85,000 worth of checks Jimmy wrote her. Of course, to be valid, a contract requires "parties with legal capacity to make a contract." *Rotenberry v. Hooker*, 864 So. 2d 266, 270 (¶13) (Miss. 2003). But this case presents a unique circumstance where Frances's mental incapacity was not a barrier to an *implied* contract arising. *See Talbert v. Ellzey*, 203 Miss. 612, 620, 35 So. 2d 628, 631-32 (1948).

¶19. In *Talbert*, the Mississippi Supreme Court recognize an implied contract existed between an incapacitated woman and her brother. *Id.* The brother had removed his incapacitated sister from the state mental hospital and took care of her until her death. According to the supreme court, "when necessaries are furnished to a person who by reason of mental incapacity cannot himself make a contract, the law implies or imposes an obligation or agreement on his part to pay for them; his liability for necessaries is deemed rather a benefit than a disadvantage to him." *Id.* (citations omitted).

¶20. Here, Becky has conceded the checks Jimmy wrote to Frances were used for Frances's benefit. While Frances lacked the mental capacity to make a contract with Jimmy to pay him back, the law recognizes she was not disadvantaged by the liability for her nursing care. So according to *Talbert*, the law imposed an obligation on Frances's part to repay Jimmy the $85,000 he expended to pay for needed care. *See id.*

## II. *Untimely Assertion of Right*

¶21. That said, we agree with the chancellor that Brett's assertion of Jimmy's right was untimely—but for a different reason. *See Methodist Hosp. of Hattiesburg, Inc. v. Richardson*, 909 So. 2d 1066, 1070 (¶7) (Miss. 2005) (citations omitted) (recognizing an appellate court may affirm a trial court's decision that reached the right result, regardless of the trial court's reasoning).

¶22. In their briefs, Becky and Brett have focused on the ninety-day period to probate a claim and whether proper notice was given. *See* Miss. Code Ann. § 91-7-145(2). But even if Brett never received proper notice—meaning section 91-7-145(2) did not mandate he file Jimmy's estate's claim by February 2011—he still had to pursue the claim within section 15-1-29's three-year statute of limitations. *See* Miss. Code Ann. § 15-1-29 (Rev. 2012) (imposing a three-year statute of limitations for unwritten implied contracts); *see also* Robert A. Weems, *Wills and Administration of Estates in Mississippi* § 2:39, at 71 (3d ed. 2003) (citing Miss. Code Ann. § 15-1-55) ("Death of the holder of the cause of action does not affect [the statute-of-limitations period] unless it occurs in the last year of the limitations period, in which case the limitation period will be extended so as to expire one year from the date of death.").

¶23. Brett claims his father's intent was to be repaid with his mother's stock upon her death. Thus, the three-year statute of limitations did not begin to run until Frances died in September 2011, making his March 2013 filing timely. But as there was no express contract formed between Frances and Jimmy, there could be no expressed date of repayment. Instead,

8

the issue is when did the implied contract between Frances and Jimmy for Frances's care end.

¶24. In *Talbert,* because the brother provided care to his sister until her death, the supreme court deemed her death the moment the implied contract terminated and the statute of limitations began to run. *Talbert,* 203 Miss. at 620, 35 So. 2d at 631. So even though the brother expended money for almost seven years before he filed a claim against his sister's estate, the court held his entire claim was timely because he had filed it within three years of his sister's death. *Id.*

¶25. In that case, however, the brother had provided *continuous* care up to the point of her death. By contrast, Jimmy stopped providing care for his mother almost two years before she died. Undisputedly, Jimmy wrote his last check to Frances in November 2009. So this is when the implied contract with Frances ended, triggering the three-year statute of limitations.

¶26. What is more, Becky created the conservatorship in January 2010 for the *very purpose* of paying Frances's financial obligations on her behalf. It is clear from the February 2010 letter that Jimmy knew about the conservatorship and the fact that all of Frances's assets—including the stocks from which Jimmy planned to be reimbursed—had been liquidated and placed in the conservatorship account. But Jimmy never asserted his $85,000 claim for repayment against the conservatorship.

¶27. After Jimmy died, it was Brett's duty, as representative of Jimmy's estate, to see any claim for repayment was asserted before the statute of limitations ran out. *See* Weems, *Wills and Administration of Estates in Mississippi* § 2:39, at 71. This duty was independent of

9

Becky's statutory duty to notify all "reasonably ascertainable creditors" of Frances's estate. So regardless of whether section 91-7-145(2) cut off Brett's ability to recover from Frances's estate after February 2012, section 15-1-29 cut off Brett's ability to pursue Jimmy's estate's right to repayment after November 2012. Because Brett did not file a claim on behalf of Jimmy's estate until March 2013, we agree with the chancellor that Brett waited too late to assert his deceased father's right to repayment. We thus affirm the order disallowing Brett's claim filed on Jimmy's estate's behalf.

¶28. **THE JUDGMENT OF THE HINDS COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.**

**LEE, C.J., GRIFFIS, P.J., BARNES, ISHEE, CARLTON, FAIR AND WILSON, JJ., CONCUR. IRVING, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. JAMES, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.**