# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-CA-01318-COA

**ERICA P. WHITE**                                                                                     **APPELLANT**

**v.**

**JASON L. BROWN**                                                                                        **APPELLEE**

DATE OF JUDGMENT:                07/22/2019
TRIAL JUDGE:                             HON. J. DEWAYNE THOMAS
COURT FROM WHICH APPEALED:    HINDS COUNTY CHANCERY COURT,
                                                    FIRST JUDICIAL DISTRICT
ATTORNEY FOR APPELLANT:        DEREK PAYTON MARTIN
ATTORNEY FOR APPELLEE:          PAUL E. ROGERS
NATURE OF THE CASE:             CIVIL - REAL PROPERTY
DISPOSITION:                    AFFIRMED - 06/30/2020
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE CARLTON, P.J., WESTBROOKS AND LAWRENCE, JJ.**

**CARLTON, P.J., FOR THE COURT:**

¶1.     This appeal stems from the Hinds County Chancery Court's order granting Jason Brown's request to remove Erica White's name from the warranty deed for Brown's home. The order also awards Brown all of the proceeds from the sale of the home.

¶2.     White now appeals, arguing that (1) Brown failed to file his complaint within the time limits of the statute of limitations and as a result, his claim is barred, and (2) the chancellor erred in his finding that a unilateral mistake was made and that White exhibited inequitable conduct.

¶3.     After our review, we find no error. We therefore affirm the chancellor's judgment.

## FACTS

¶4. On March 6, 2008, Brown purchased a home in Byram, Mississippi, located at 525 Golden Eagle Drive, Byram, Mississippi. At the time Brown purchased the home, he and White were in a dating relationship. The parties were never engaged or married, and the relationship produced no children.

¶5. The record reflects that both White and Brown were present at the closing for the purchase of the home in March 2008. Shortly after the closing, Brown and White moved in and began to reside at the home. Approximately a month later, the couple ended their relationship, and White moved out of the residence. White and Brown had no communication about the home from that time until the fall of 2018—a period of over ten years.

¶6. The testimony at trial reflects that the loan for the home is in Brown's name, and Brown made all of the mortgage payments for the home. The testimony also reflects that at no point did White ever make any payments toward the mortgage or utilities for the home. White testified that she did, however, purchase the furniture, appliances, and paint for the home. She claimed that she was unable to retrieve any of the furniture or appliances when she moved out of the home. However, Brown testified that when White moved out, she "took just about everything out of the house" except for the couch and bed.

¶7. In the fall of 2018, Brown sought to sell the home. Brown states at this time, he first discovered that the warranty deed to the home was mistakenly in the name of "Jason L. Brown and Erica P. White as joint tenants with full rights of survivorship and not as tenants

in common." Brown contacted White and informed her of the mistake on the deed, and he requested that she sign a quitclaim deed conveying her interest in the subject property to him. In response, White refused to sign a deed conveying any interest unless she received one-half of the proceeds from the sale of the home.

¶8. Brown then filed a complaint for injunctive relief, declaratory relief, and damages on January 2, 2019. In the complaint, Brown alleged that White's name was included on the warranty deed for the home "through the scheme, artifice[,] and subterfuge" of White. In support of his claim that White was not intended to be named on the warranty deed, Brown asserted that all closing documents regarding the home are solely in Brown's name and do not reflect White's name, nor were the documents signed by White. Brown further asserted that the deed of trust for the loan secured by the home identifies Brown as a single man and does not list White as a mortgager or owner. White did not sign the deed of trust.

¶9. That same day, the chancellor entered an order directing White "to immediately execute . . . a deed conveying her unintended interest in the property to the expectant Buyer" of the home. The chancellor further ordered that one-half of the net sales proceeds be paid into the registry of the court, which would be disbursed upon further order of the court. The chancellor set a hearing for the matter to be held on January 16, 2019.

¶10. On January 15, 2019, the day before the hearing, White filed a motion to set aside the chancellor's order and for a continuance. White asserted she was served with Brown's complaint on January 3, 2019, and she was therefore served subsequent to the entry of the

3

chancellor's January 2, 2019 order. White further stated her counsel had a conflict on January 16, 2019, and she requested that the chancellor grant a continuance in the matter.

¶11. The record reflects that a hearing on the matter was held on January 17, 2019, and both parties and their counsel attended. On January 18, 2019, the chancellor entered a second order reflecting that Brown and White had agreed upon a partial resolution of the matter. The chancellor ordered that White "shall fully cooperate" in the sale of the home and execute a proper deed of conveyance so the home could be sold and closed. The chancellor also ordered the closing attorney to retain the net proceeds from the sale in escrow until further order.

¶12. On May 6, 2019, the chancellor entered an agreed order setting the matter for trial on June 4, 2019. The order reflects that the parties had completed discovery.

¶13. On June 3, 2019, the day before trial, Brown filed an application with the chancery court clerk requesting the clerk to make an entry of default against White based on her failure to file an answer in the matter. Brown then filed a motion for an entry of default judgment against White.

¶14. White filed a response to the motion for default, arguing that although she had not filed an answer, her attorney had entered an appearance on January 3, 2019, by filing a motion to set aside the chancellor's January 2, 2019 order and continue the matter. White stated that she also appeared in court on January 17, 2019, to be heard on the merits of her motion to set aside the chancellor's order. Furthermore, White asserted that her counsel "has

4

had constant communication with [Brown's] counsel regarding intent to defend the case on the merits." On June 4, 2019, the chancery clerk entered a docket entry of default against White.

¶15. A bench trial was held on June 4, 2019. At a pretrial hearing, Brown informed the chancellor that he had filed a motion for default judgment against White and that White had responded to the motion. Brown requested that the chancellor therefore treat the motion for default judgment as a motion in limine and prohibit White "from presenting anything affirmative" at trial based on White's failure to file an answer, affirmative defenses, or a counterclaim. In response, White argued that her motion to set aside the chancellor's January 2, 2019 order and for a continuance constituted a responsive pleading.

¶16. White then made an ore tenus motion to dismiss the case based on the statute of limitations. White argued that the deed was filed in 2008, and a three-year statute of limitations applies to allegations of fraud or misrepresentation. The chancellor did not rule on White's motion; however, the trial proceeded. After Brown rested, White renewed her motion to dismiss the case based on the statute of limitations, which the chancellor denied.

¶17. At trial, the chancellor heard testimony from White, Brown, and White's mother, Patricia White. White testified that Brown told her "he wanted to buy a house for [her]." White testified that she and Brown looked for and found the home together and that they intended to pay for the loan together. White admitted that she never made any house payments. However, White testified that she bought the appliances, furniture, and paint for

the house.

¶18.    White also testified that she and Brown were both at the closing of the house sale. Regarding the closing documents, White explained that her name was not on the loan for the home because she did not sign the loan documents.  White testified that her name did appear on the contract for the sale and purchase of the home because she signed both her name and Brown's name, "with [Brown's] permission."  When asked why the title to the home was in both her name and Brown's name, White answered, "Because he told me he was buying the house for me."  White also testified that she signed all of Brown's documents at the closing for him because he had poor penmanship.

¶19.    White testified that the deed was eventually mailed to the home.  White claimed that Brown opened the envelope containing the deed and gave it to her "for safekeeping."  White admitted that she still has the deed "somewhere" at her mother's house.  White also admitted that after she moved out of the home in April 2008, she and Brown had no contact with one another until fall of 2018, a period of over ten years.

¶20.    White testified that in late 2018, Brown called her and asked her to sign a quitclaim deed conveying her interest in the home to him.  White testified that she refused to sign the deed unless Brown paid her the money he still owed her for the furniture that remained in the home and paid her "half of the proceeds" from the sale.  White explained that "[t]he house was both of ours.  My name was on the deed."  White estimated that she spent about $2,900 on furniture for the home.

6

¶21. Brown testified that he never intended for White's name to be on the deed to the home. According to Brown, he first learned that White's name was on the deed in the fall of 2018, when he attempted to sell the home. Brown testified that his realtor called him and asked "Who is Erica White? We need her signature. Her name is on the deed." Brown testified that he never received a copy of the deed in the mail and he denied White's claim that he gave her the deed for safekeeping. He stated that "If I would have known she was on the deed, I'd have gotten her name [removed] ten years ago, not wait ten years and then try to get her name off the deed." Brown testified that the first time he ever saw a copy of the deed was in November 2018 when he went to the courthouse and requested a printout of the deed.

¶22. Brown testified that White never told him she was moving out of the home. Instead, he arrived home from work one day and found the front door "wide open." Upon entering the home, Brown discovered that White had "took just about everything out of the house" except for the couch, refrigerator, and bed. Brown stated that White came back later with "a little moving crew" and took the refrigerator. Brown testified that after that, he changed the locks to the home.

¶23. At the conclusion of Brown's testimony, White renewed her motion to dismiss the case based on the statute of limitations and also moved for a directed verdict. White argued that the statute of limitations for fraud is three years, and Brown filed his complaint well outside of the statutory limitations period. White also argued that Brown failed to meet his

7

burden of proof in this case, explaining that Brown failed to put forth any evidence or witnesses to show that the deed was invalid. The chancellor denied the motion, and the trial proceeded. At the end of the trial, the chancellor asked the parties to submit any proposed findings of facts and case law for the chancellor to consider.

¶24. On July 22, 2019, the chancellor entered an order ruling in favor of Brown and awarding Brown all of the proceeds from the sale of the home. In his order, the chancellor stated that although the evidence at trial did not show beyond a reasonable doubt that White committed fraud, the evidence did show "beyond a reasonable doubt that a unilateral mistake was made and that White exhibited inequitable conduct." The chancellor explained that "[t]he evidence at trial clearly established that Brown never intended White to be on the deed and that the inclusion of her name was an honest mistake or a result of her inequitable conduct." The chancellor further found that "White did not have any possessory interest in the home and did not act in good faith in having her name added to the deed." The chancellor therefore held that "[t]o allow White's name to remain on the deed and receive the proceeds from the sale of the property would be to unjustly enrich her . . . [and] would allow White to benefit from the ten years of mortgage payments made solely by Brown." The chancellor stated that to allow such would "be inequitable and unconscionable."

¶25. White filed a motion for reconsideration arguing that she was entitled to an equitable distribution of the proceeds. White asserted that the chancellor erred in addressing the legal concepts of unilateral mistake and inequitable conduct, which were outside the scope of

8

evidence presented at trial. In support of her argument, White claims that at trial, Brown "only presented evidence alleging [White] committed fraud and provided no consideration for the deed." White argued that the evidence at trial show that she did indeed provide adequate consideration for the deed—her "love and affection." White further argued that the chancellor erred by failing to address the statute of limitations, which bars Brown's complaint.

¶26. On July 25, 2019, the chancellor entered an order denying White's motion for reconsideration after finding that White failed to make a "showing of mistake, inadvertence, newly discovered evidence[,] or fraud in [the chancellor's] original order" and failed to provide a "new cause for reconsideration of this matter."

¶27. On August 20, 2019, White filed her notice of appeal from the chancellor's July 22, 2019 order ruling in favor of Brown and the chancellor's July 25, 2019 order denying her motion for reconsideration.

## STANDARD OF REVIEW

¶28. This Court "will not disturb a chancellor's findings unless they are manifestly wrong, clearly erroneous, or apply the wrong legal standard." *Campbell Props. Inc. v. Cook*, 258 So. 3d 273, 275 (¶9) (Miss. 2018). "We review questions of law de novo." *Id*.

## DISCUSSION

### I.    Statute of Limitations

¶29. White argues that Brown's claim is barred under the three-year statute of limitations

9

for fraud. White asserts Brown knew that she was present at the closing in 2008 and that Brown should have known her name was on the deed when he reviewed the closing documents at that time. White therefore maintains Brown has no valid defense for his failure to discover White's alleged fraud prior to the expiration of the statutory limitations period. White further argues that Brown's claim of concealment of fraud lacks merit because the warranty deed was recorded as a public record.

¶30.    Brown's response to White's argument is two-fold. First, he maintains that White failed to file an answer or any form of responsive pleading in the proceedings below in which she raised the statute of limitations as an affirmative defense to Brown's complaint. As a result, Brown asserts that White's argument regarding the statute of limitations is barred from review. Second, Brown argues that this action is not barred by the statute of limitations because Mississippi Code Annotated section 15-1-9 (Rev. 2003) provides a ten-year statute of limitations for recovery of an interest in land in equity. Brown further submits that he did not set forth any claims of fraud in his complaint; rather, his complaint alleged inequitable conduct.

¶31.    Mississippi Rule of Civil Procedure 8(c) mandates that "[i]n pleading to a preceding pleading, a party shall set forth affirmatively . . . statute of limitations . . . and any other matter constituting an avoidance or affirmative defense." The Mississippi Supreme Court "has interpreted this rule to mean that, generally, if a party fails to raise an affirmative defense in its original answer, the defense will be deemed waived." *Hutzel v. City of*

10

*Jackson*, 33 So. 3d 1116, 1119 (¶12) (Miss. 2010). The supreme court has further held that "[o]rdinarily, delay coupled with active participation in a lawsuit serves to waive affirmative defenses that otherwise would terminate the action." *Id*. "To pursue an affirmative defense means 'to plead it, bring it to the court's attention, and request a hearing.'" *Univ. of Miss. Med. Ctr. v. Hampton*, 227 So. 3d 1138, 1144 (¶19) (Miss. Ct. App. 2016) (quoting *Estate of Grimes v. Warrington*, 982 So. 2d 365, 370 (¶23) (Miss. 2008)).

¶32. The record before us reflects that White first raised the affirmative defense of the statute of limitations on the day of trial during a hearing on preliminary matters. During the hearing, White made an ore tenus motion to dismiss the action based on the statute of limitations. White argued that the deed was filed in 2008 and that a three-year statute of limitations applies to allegations of fraud or misrepresentation. The chancellor denied the motion, and the trial proceeded.

¶33. Our review of the record also shows that White did not file an answer to Brown's complaint. However, on January 15, 2019, White filed a motion to set aside the chancellor's January 2, 2019 order and continuance of the matter. At the pretrial hearing on Brown's motion to prohibit White from raising any affirmative defenses at trial based on her failure to file an answer, White argued that her January 15, 2019 motion constituted a responsive pleading. However, White did not raise the issue of the statute of limitations in her January 15, 2019 motion.

¶34. The record further reflects that in her June 3, 3019 response to Brown's motion for

11

default judgment, White acknowledged that in addition to filing her January 15, 2019 motion, she and her counsel appeared in court on January 17, 2019, to be heard on the merits of her motion. Furthermore, White asserted that during the proceedings in the case, her counsel "has had constant communication with [Brown's] counsel regarding intent to defend the case on the merits." The record also reflects that the parties engaged in and completed discovery prior to setting the matter for trial.

¶35. After our review of the record, we find that White waived her right to assert the affirmative defense of the statute of limitations. White, by her own assertion, actively participated in the litigation, and "the record reveals no unusual or extreme circumstances that explain [White's] failure to assert the affirmative defense[] in a timely manner." *Hutzel*, 33 So. 3d at 1121 (¶19). We therefore affirm the chancellor's judgment here.

## II. Unilateral Mistake

¶36. White also argues that the chancellor erred in holding that a unilateral mistake was made and that White exhibited inequitable conduct. White argues that Brown never made any claims regarding unilateral mistake or inequitable conduct.[1] She also asserts that at trial, Brown failed to present sufficient evidence to show that such actions occurred.

---

[1] Brown argues that in his complaint, he alleged inequitable conduct by White. However, this Court may review the issue regardless of whether Brown made a claim for inequitable conduct in his complaint. In *Rotenberry v. Hooker*, 864 So. 2d 266, 270 (¶16) (Miss. 2003), the supreme court held that although the plaintiff "did not assert unilateral mistake in her pleadings, the chancellor made specific findings in resolving the issue[;]" as a result, "we are not limited in our review of the issue." In the case before us, the chancellor made specific findings regarding unilateral mistake; therefore, we may review the issue.

12

¶37. White additionally claims that the chancellor based his ruling that a unilateral mistake was made "on the premise that [White] did not provide adequate consideration and the mistake or bad faith would unjustly enrich [White]." White asserts that the chancellor was misguided on this matter, because "love is considered adequate consideration." In support of her assertion, White cites *Herrington v. Herrington*, 232 Miss. 244, 250-51, 98 So. 2d 646, 649 (1957), which provides that "[a] man of sound mind may execute a will or a deed from any sort of motive satisfactory to him, whether that motive be love, affection, gratitude, partiality, prejudice or even a whim or caprice."

¶38. In response, Brown argues that the evidence presented at trial clearly established that he never intended for White to be on the deed to the home and that White admitted that she signed both parties' names to the contract for sale. As to White's argument that her love and affection served as sufficient consideration for her name to be on the deed, Brown correctly asserts that the rule of law she cites in her brief is not applicable in this case because he did not execute the deed or any other document transferring an interest in the home to White.

¶39. Turning to review the chancellor's finding that a unilateral mistake occurred and that White exhibited inequitable conduct, we recognize that "[i]n an action to reform a deed based on a mistake theory, the petitioner must demonstrate a mutual mistake among the parties or a unilateral mistake in combination with fraud or inequitable conduct on the part of the benefitting party." *McCoy v. McCoy*, 611 So. 2d 957, 961 (Miss.1992). The petitioner must prove the unilateral mistaken and fraud or inequitable conduct "beyond a reasonable doubt."

13

*Id*.; *see also Dunn v. Dunn*, 786 So. 2d 1045, 1049 (¶14) (Miss. 2001) ("The evidence presented to justify reformation of a deed must be sustained by proof beyond a reasonable doubt."). Here, Brown bears the burden of demonstrating a unilateral mistake in combination with inequitable conduct on the part of White, and he must prove this beyond a reasonable doubt.

¶40.    In *Thweatt v. Thweatt*, 4 So. 3d 1085, 1087 (¶1) (Miss. Ct. App. 2009), Ronald Thweatt filed a complaint for partition of the marital home after he and his wife Beverly separated.    Beverly then filed a counter-complaint to remove Ronald's name from the warranty deed for the home.[2]  *Id*.

¶41.    The evidence presented in that case reflected that in April 2004, prior to the couple's marriage, "Beverly purchased the home in dispute . . . outright and paid all sums connected with the purchase and closing with the proceeds from the sale of the original marital home." *Id*. at (¶3).  Ronald testified "that he paid no money for the purchase of the home . . . and he had not paid any bills or upkeep expenses since its purchase."  *Id*. at 1087-88 (¶5).  The warranty deed, which was executed on April 30, 2004, reflected that the home was deeded to "Beverly T. Thweatt and husband, William R. Thweatt, as joint tenants with full rights of survivorship and not as tenants in common."  *Id*. at 1087 (¶4).

¶42.    At trial, "Beverly testified that Ronald insisted that his name be added to the deed[,]"

---

[2] At the time of trial and at the time of Ronald's appeal, the Thweatts were still legally married, but they had been separated since August 2004.  *Id*. at (¶2).

14

and she did not object because they were planning to get married. *Id*. The parties were married on June 16, 2004. *Id*. However, "[d]uring the first week of August 2004, Ronald moved out of the home and moved in with his longtime paramour." *Id*.

¶43.   After hearing the evidence and testimony, the chancellor denied Ronald's request to partition the marital home. *Id*. at 1088 (¶8). As to the warranty deed, the chancellor found that "Beverly allowed Ronald's name to be added to the warranty deed based on the mistaken belief that Ronald was going to marry her and the home was to be their new marital home." *Id*. at 1089-90 (¶13). The chancellor determined that "Ronald had lived in the . . . home for less than a month after the wedding and contributed no financial support to the household" and therefore held that "Ronald was not entitled to any relief as he did not act in good faith when re-entering the bonds of matrimony with Beverly." *Id*. at 1088 (¶6). The chancellor accordingly granted Beverly's request and ordered Ronald's name removed from the warranty deed. *Id*. at (¶7).

¶44.   On appeal, this Court affirmed the chancellor's judgment, explaining:

> If Ronald's name was allowed to remain on the warranty deed and the partition was allowed to take place with Ronald receiving a portion of the proceeds, he would be unjustly enriched. This would allow him to take proceeds from a home in which he had lived for only three weeks and in which he had never put any money or effort toward the purchase or upkeep.

*Id*. at 1090 (¶15).

¶45.   In the case before us, the chancellor entered an order ruling in favor of Brown and directing White's name to remove from the deed. In his order, the chancellor cited to *McCoy*

15

and acknowledged that Brown bore the burden of proving unilateral mistake in combination with fraud or inequitable conduct on the part of White, the benefitting party, beyond a reasonable doubt. The chancellor then stated that although he could not find beyond a reasonable doubt that White committed fraud, the evidence did show "beyond a reasonable doubt that a unilateral mistake was made and that White exhibited inequitable conduct." The chancellor explained that "[t]he evidence at trial clearly established that Brown never intended White to be on the deed and that the inclusion of her name was an honest mistake or a result of her inequitable conduct." The chancellor stated that "[i]n either event, this Court will not unjustly enrich White for the mistake or bad faith."

¶46. The chancellor further found that the evidence and testimony showed that "White did not have any possessory interest in the home and did not act in good faith in having her name added to the deed." The chancellor cited to *Thweatt* and explained that allowing White's name to remain on the deed "would allow [her] to take proceeds from a home in which [she] had lived for only three [to four] weeks and in which [she] had never put any money or effort toward the purchase or upkeep." The chancellor therefore held that "[t]o allow White's name to remain on the deed and receive the proceeds from the sale of the property would be to unjustly enrich her." The chancellor stated that "[e]ven more, the same would allow White to benefit from the ten years of mortgage payments made solely by Brown. This [c]ourt finds the same to be inequitable and unconscionable."

¶47. Our review of the testimony reflects that White admitted that she signed both her

name and Brown's name to the contract for the sale and purchase of the home. The contract for sale therefore indicated that title was to be conveyed to both Brown and White. White testified that Brown gave her permission to sign the contract in that manner and she explained that the warranty deed was in both of their names "[b]ecause [Brown] told [her] he was buying the house for [her]."

¶48. Brown testified, however, that he never intended for White's name to be on the warranty deed to the home. Brown stated that he first learned that White's name was on the deed in the fall of 2018. He explained that after the closing, he never received a copy of the deed in the mail. As stated above, White testified that a copy of the warranty deed was mailed to the home, and she admitted that she still possessed the deed. Brown testified that if he had known White's name was on the deed, he would have taken action to remove her name ten years ago.

¶49. Additionally, the testimony and evidence presented at trial showed that White lived in the home for approximately a month. White admitted that she never paid any amount of money towards the mortgage payment, utilities, or other expenses at the home. Brown paid for the mortgage on the home and his name was on all of the loan documents for the home.

¶50. After our review, we find that the chancellor properly weighed the evidence and testimony and applied the applicable case law. We find no error, and we therefore affirm the

chancellor's judgment.[3]

¶51.   **AFFIRMED.**

   **BARNES, C.J., J. WILSON, P.J., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY AND C. WILSON, JJ., CONCUR.**

---

[3] Although White's notice of appeal reflects that she is also appealing from the chancellor's order denying White's motion for reconsideration, White does not set forth any arguments in her appellate brief addressing this order. "A motion for reconsideration is treated as a motion to amend the judgment pursuant to Rule 59(e) of the Mississippi Rules of Civil Procedure[.]" *Harris v. Harris*, 167 So. 3d 1254, 1257 (¶11) (Miss. Ct. App. 2014) (quotation omitted). We recognize that "to succeed on a Rule 59(e) motion, 'the movant must show: (i) an intervening change in controlling law, (ii) availability of new evidence not previously available, or (iii) need to correct a clear error of law or to prevent manifest injustice.'" *Id*. We review a chancellor's denial of a Rule 59 motion for an abuse of discretion. *Id*. Upon our review, we find that White's motion for reconsideration failed to show any "intervening change in controlling law"; "the availability of new evidence not previously available"; a "need to correct a clear error of law"; or a need "to prevent manifest injustice." *See id.* We therefore find the chancellor did not abuse his discretion in denying White's motion.